Patrick L. **GALLAGHER**, Plaintiff,

v.

**RELIANCE STANDARD LIFE INSURANCE COMPANY,** Defendant.

No. 3:99CV429–MU.

United States District Court, W.D. North Carolina, Charlotte Division.

Nov. 6, 2001.

Edward G. Connette, Lesesne & Connette, Charlotte, NC, for Plaintiff.

Bradley R. Kutrow, Smith, Helms, Mulliss & Moore, L.L.P., Joshua Bachrach,

Rawle & Henderson, L.L.P., Philadelphia, PA, for Defendant.

## ORDER

MULLEN, Chief Judge.

**THIS MATTER** is before the Court on cross Motions for Summary Judgment filed by Plaintiff Patrick Gallagher and Defendant Reliance Standard Life Insurance Company ("Reliance") [docs. 14 & 17]. All responses have been filed and this matter is ripe for resolution.

### I. Background

This case concerns a disability claim under the Employee Retirement Income Security Act of 1974 ("ERISA"). Patrick Gallagher, 57, worked for 26 years as a corporate officer and publisher at Good Will Publishers, Inc. ("GWP") in Gastonia, North Carolina. Specifically, Gallagher devoted most of his time to management of GWP's wholesale and overseas operations. (Def.'s Ex. 21 at 3, ¶ B & Pl. at 311–316.) The job required 3–4 hours a day of word processing and some international travel. However, other than the rigors of travel, including the ability to carry luggage, Gallagher's job was primarily sedentary.

Gallagher is covered by GWP's long-term disability policy ("the Plan"), an employee welfare benefit plan governed by ERISA and funded by Reliance. GWP is the Plan Administrator, and Reliance is a fiduciary with responsibility for making claims determinations. The relevant provisions of the policy state:

**Elimination Period:** 90 consecutive days of Total Disability.

"Totally disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:

I. during the Elimination Period, and Insured **cannot perform each and every material duty of his/her regular occupation;**

**Insuring Clause:** We will pay a Monthly Benefit if an Insured:

(1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy;

(2) is under the regular care of a Physician unless the Insured has reached the maximum point in his/her recovery where medical services will no longer help him/her;

(3) has completed the Elimination Period; and

(4) **submits satisfactory proof of Total Disability to us.**

Unfortunately, Gallagher has suffered from back pain on and off since the 1980's. (Pl. at 381.) By 1986, Gallagher was in severe pain and sought medical treatment. (*Id.*) Tests performed at that point, showed a herniated nucleus pulposus[1] in his lumbar spine. (*Id.*) His condition did not improve and Gallagher underwent a suction discectomy at L4–5. (*Id.* at 381.) The surgery offered about an 80 percent improvement, but walking, standing and sitting all remained difficult. (*Id.*)

In 1990, Gallagher began treatment for his lingering pain at the Key Biscayne Medical Clinic and, eventually, took time off from work to pursue this treatment. During this time, Dr. Marc Shapiro discovered a small central disc herniation at L1 and L2, as well as bulging of L2, L3, L4, and L5–S1. (*Id.*) Dr. Shapiro also found that Gallagher had diffuse degenerative disc disease and spurring on the facets[2] throughout the lumbar spine. (*Id.*)

---

**1.** The *nucleus pulposus* is the soft fibrocartilage central portion of the intervertebral disk. STEDMAN'S MEDICAL DICTIONARY, 1070 (25th ed.1990).

**2.** A *facet* is a small smooth area on the bone. STEDMAN'S MEDICAL DICTIONARY at 556.

An MRI taken May 8, 1998, showed spondylitic changes in his lumbar spine producing a mild stenosis of the central canal secondary to a diffusely bulging disc. (Pl. at 389.) Therefore, despite surgery and treatment, Gallagher continues to suffer low back pain. (*Id.* at 383–84.)

Furthermore, in the 1990's, Gallagher began to suffer nerve pain in his neck and left arm. (*Id.* at 384.) In 1997 his cervical spine pain became severe and his doctors detected several problems with C6, C7 and the first thoracic. (*Id.* at 388.) Specifically, Dr. Frank Eismont, a neurosurgeon, found that Gallagher suffered from arthritic changes and foraminal stenosis in C5–6, C6–7, causing a significant compression of his nerve root. (Pl. at 305–307, letter of Dr. Eismont, October 29, 1997.) Dr. Eismont suggested that it may become necessary for Gallagher to undergo a "corpectomy," which would include a cadaver bone graft and the insertion of titanium screws to reinforce a fusion of the vertebrae. (*Id.*) Gallagher opted for a reduction in his physical activities in hopes of avoiding that procedure. (Pl. at 387, letter of Dr. Aizcorbe, July 3, 1998.)

In summary, Gallagher suffers severe and chronic cervical, lumbar, and left side pain. (Pl. 201–203, letter of Dr. Aizcorbe, June 1, 1999.) This pain causes Gallagher nervousness and impairs his ability to concentrate, reason, and interact with others. (*Id.*) For these reasons, Gallagher retired from his job on May 2, 1998.

On July 10, 1998, GWP forwarded Gallagher's disability benefit application to Reliance. In support of his disability claim, Gallagher submitted MRI's of his lumbar and cervical spine, a CT scan, and opinions from Dr. R.C. Aizcorbe and Dr. Sivalingam Siva. Dr. Aizcorbe, who has treated Gallagher since 1980, recommended as early as 1997 that Gallagher prepare to do no work.

(Pl. at 387.) With respect to his condition at the time of the disability application, Dr. Aizcorbe stated:

At this point, Mr. Gallagher has resigned his position. He is more or less using a brace if he stands up or sits in a chair, and he wears a cervical collar if he has to be driven by his wife to the doctor or any other facility. It is because of all this that I find Mr. Gallagher to be totally and permanently disabled to do any gainful work.

(Pl. at 388.)

On July 29, 1998, Dr. Aizcorbe completed a Physician's Statement detailing Gallagher's physical limitations. (Def's Ex. 8.) In Dr. Aizcorbe's opinion, during an eight-hour work day, Gallagher could sit for one hour and stand for one hour, but could not drive or walk at all. (*Id.*) In addition, although Gallagher was severely limited in his ability to bend, squat, climb, lift, etc., he was capable of "simple grasping" and "fine manipulation" with his "upper extremities." (*Id.*)

For reasons that will be shown below, in making its determination, Reliance utilizes job descriptions from the Department of Labor's Dictionary of Occupational Titles ("DOT") as approximations of the applicant's job duties. Under the DOT, Gallagher's job is classified as sedentary and most closely resembles descriptions for a "publications editor" and "vice president." The DOT describes these positions as requiring tasks such as executive decision making and coordination, reading, writing, editing, making staff assignments, conducting interviews, evaluating employees, developing long range goals, analysis of company activities, and conferencing.

Reliance sent Dr. Aizcorbe these two descriptions for his opinion on Gallagher's capability.[3] (Pl. at 269–270.) Dr.

---

**3.** Apparently, Reliance also sent the DOT de- scriptions to Dr. Siva who failed to respond.

Aizcorbe's review of the DOT tasks indicate that Gallagher could not effectively perform most of the listed tasks. However, Gallagher was conceivably capable of directing department activities, reading and evaluating material, and reviewing final proofs. (*Id.*)

Dr. Sivalingam Siva, a neurosurgeon, saw Gallagher on May 22, 1998 for the purpose of treating his cervical spine problems. (Pl. at 349–50.) In his notations after that consultation, Dr. Siva concluded that "because of his multiple problems and subsequent emotional status I doubt that he (Gallagher) is functional at this time." (*Id.*) On June 1, 1998, Dr. Siva wrote a letter to Dr. Aizcorbe in which he concluded:

> Since Mr. Gallagher has multiple level degenerative changes both in the lumbar as well as in the cervical region and his reluctance to have any surgical intervention I doubt that he will be able to return to his usual employment. I feel that due to the chronic pain in the multiple level degenerative changes of the spine Mr. Gallagher is having considerable difficulty handling this problem. In view of all this I feel that in all probability Mr. Gallagher will not be gainfully employed.

(Pl. at 73–4.)

After conducting its own review, Reliance denied Gallagher's claim in a letter dated February 2, 1999. Reliance denied Gallagher's claim because it was not satisfied that he had a medical condition that prevented him from performing "each and every material duty of his regular occupation." Reliance reached this conclusion for a number of reasons. First, Reliance interprets "each and every" to mean that an insured must be unable to perform *any* material duty. Thus, to become eligible

for benefits, a claimant must be unable to perform any material part of his occupation, and not merely unable to function at a normal level.

Additionally, Reliance interprets "regular occupation" to cover only the duties performed in a typical work setting for any employer in the general economy, not the unique aspects of an insured's actual job with a specific employer. Consequently, Reliance utilizes DOT descriptions as a measure of the generalized aspects of an occupation. As noted previously, Dr. Aizcorbe found that Gallagher was capable of performing some of the duties listed in the DOT descriptions. In addition, Thomas Hardy, a vocational expert who works for Reliance, performed a functional assessment of Gallagher's work requirements.[4] In a report dated January 25, 1999, Hardy found that despite Gallagher's physical limitations he was still able to perform certain sedentary executive and editorial functions. (Def.'s Ex. 20.)

Reliance also had its nurse review Gallagher's medical information. In her opinion, Gallagher could perform his job on a part-time basis. (Pl. at 234.) In addition, she indicated that there is no evidence of a change in Gallagher's condition on or about his last day of work which precipitated his resignation. (Pl. at 235.) Consequently, Reliance concluded that Gallagher was just as capable of performing his job during the elimination period as he had been in the previous years when he continued to work despite his complaints of pain.

On April 8, 1999, Gallagher wrote Reliance to appeal the denial of his claim. (Pl. at 230.) Gallagher submitted as additional evidence letters from his employer and various vocational and health care experts. On June 3, 1999, Father John Bradley, a

---

**4.** The duties listed in the DOT do not include concentration and exercise of judgment and Hardy did not consider the impact Galla-

gher's condition could have on those cognitive functions.

co-worker with intimate knowledge of Gallagher's circumstances, wrote a letter to Reliance on Gallagher's behalf. (Pl. at 218–219.) In that letter, Father Bradley noted that GWP had tried to accommodate Gallagher's desire to continue to work. (*Id.*) Father Bradley opined that:

> Patrick's lower back continued to degenerate and his cervical spine problems began resulting in numerous rehab leaves of absences (sic). Because of the upper and lower back problems getting progressively worse, Patrick could not travel nor work nor perform his duties on a regular and consistent basis. The only option unfortunately for the Company was his resignation which occurred in 1998.

(*Id.*)

William H. Haney, a Certified Rehabilitation Counselor, provided Reliance with a vocational assessment. (Pl. at 194–96.) After reviewing Gallagher's vocational and medical history, Mr Haney wrote "Mr. Gallagher has no vocational capacity to perform work even at the Sedentary level of exertion. He is unable to perform any part time work ... He is unable to stand, walk, sit, or maintain a position compatible with gainful activity." (*Id.* at 196.)

Dr. Frank Chevres, a Fellow of the American Board of Disability Analysts reviewed Gallagher's claim of disability. In a letter dated June 1, 1999, a year after the elimination period began, Dr. Chevres concluded that Gallagher had gone through some unspecified period of where he was "partially disabled" but he was "now totally disabled."(Pl. at 210.)

Additionally, Reliance contacted Gallagher July 24, 1998 and urged him to apply for Social Security benefits. Dr. Michael Heinig, an orthopaedist, performed a con-

sultative examination at the request of the Social Security Administration and Reliance had access to his conclusions during the administrative review process. (Df.'s Ex. 14.) Dr. Heinig examined Gallagher on October 6, 1998, and diagnosed him with "cervical stenosis and lumbar spondylosis, chronic."[5] (*Id.*) In addition to these physical findings, Dr. Heinig's notes indicate that Gallagher was working in October 1998 as a college professor, even though he was claiming to be totally disabled. (*Id* .) However, notwithstanding this circumstance, Dr. Heinig found that "overall ... it would be difficult for him to do much in the way of work." (*Id.*) Consequently, the Social Security Administration found that he was totally disabled and entitled to receive benefits.

Reliance was unpersuaded by this additional information. In a letter dated October 13, 1999, Reliance denied Gallagher's appeal for the same or similar reasons that it denied his claim. Having exhausted his administrative remedies, Gallagher filed this ERISA action on October 21, 1999.

## II. Legal Analysis

### a. Standard of Review under ERISA

■ As an initial matter, Gallagher and Reliance dispute whether the Plan grants Reliance discretion over the eligibility determination. When a plan grants an administrator discretionary authority to determine eligibility or to construe the terms of the plan, the denial of benefits must be reviewed for abuse of discretion. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 111, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). "Under this deferential standard, the administrator or fiduciary's decision will not be disturbed if

---

**5.** *Spondylosis* is a nonspecific reference to any lesion of the spine of a degenerative nature. STEDMAN'S MEDICAL DICTIONARY at 1456.

it is reasonable, even if this court would have come to a different conclusion independently." *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir.1997). However, plenary or *de novo* review is presumed and the plan administrator bears the burden of demonstrating that the abuse of discretion standard applies. *See Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 251–52 (2d Cir.1999); *Firestone*, 489 U.S. at 115, 109 S.Ct. 948.

■ The insuring clause of the instant plan states that in order for the insured to qualify for a monthly benefit, he must "submit[ ] satisfactory proof of Total Disability to us (Reliance)." Without question, there exists an abundance of well-reasoned opinions holding that this clause does *not* confer discretion on plan administrators. *See e.g., Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 251–52 (2d Cir.1999); *Brown v. Seitz Foods, Inc. Disability Benefit Plan*, 140 F.3d 1198, 1200 (8th Cir.1998); *Herzberger v. Standard Ins. Co.*, 205 F.3d 327 (7th Cir.2000); and *Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir.1999) (en banc). However, the Fourth Circuit appears to be leaning in the other direction.

In *Wilcox v. Reliance Standard Life Ins. Co.*, 175 F.3d 1018, 1999 WL 170411, (4th Cir. March 23, 1999) (table), an unreported decision, the Fourth Circuit held that the Plan does operate to grant discretion. With respect to the relevant language the *Wilcox* court stated:

Though the Fourth Circuit has not had occasion to construe "satisfactory to us"

language as granting discretion ... [o]nly the most tortured reading of the language in Reliance's "Insuring Clause" could lead to a conclusion that the plan in this case is not vested with the discretionary authority to determine eligibility for benefits.

175 F.3d 1018, 1999 WL 170411, at *2 (4th Cir. March 23, 1999) (table) (citations omitted) [6]. However, the *Wilcox* court also found that the abuse of discretion standard must be modified to account for the inherent conflict of interest that exists where the plan administrator acts as both fiduciary and insurer. *Id.* (citing *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228 (4th Cir.1997)); *See also, Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 152 (4th Cir.1996) (holding abuse of discretion standard not applied in as deferential a manner where fiduciary has financial interest in decision).

■ ERISA is founded on trust principles and ERISA fiduciaries have a duty to act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). While conflicts of interest are tolerated by ERISA, they must also be considered as a factor in determining whether a plan administrator and fiduciary has abused its discretion. *See Ellis*, 126 F.3d at 233. When a conflict arises, the deference normally accorded a fiduciary's decision "will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Ellis*, 126 F.3d at 233 (quoting *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 152 (4th Cir. 1996)). Thus, the relevance of the conflict

---

**6.** Interestingly, the *Wilcox* court did not discuss any possible distinction between plans that require the submission of proof "satisfactory to us" and plans that require the submission of "satisfactory proof of disability to us." This distinction has been recognized in recent opinions published in other circuits. *See Herzberger v. Standard Ins. Co.*, 205 F.3d 327 (7th Cir.2000) (distinguishing the Seventh

Circuit's prior holding in *Donato v. Metropolitan Life Insurance Co.*, 19 F.3d 375, 379–80 (7th Cir.1994)); *Kinstler*, 181 F.3d at 251–52 (2d Cir.1999) ("unless a policy makes it explicit that the proof must be satisfactory *to the decision-maker*, the better reading of 'satisfactory proof' is that it establishes an objective standard, rather than a subjective one.").

is judged on a case-by-case basis and the deference given to an administrator's decision is modified according to a "sliding scale" of additional scrutiny. *Id.* "The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it." *Id.*

Although Gallagher has advanced a persuasive argument in favor of *de novo* review, the disposition of this case would be the same under either standard and the Court will conduct its review under the modified deference analysis.

**b. Review of Denial**

■ Gallagher takes a number of exceptions to Reliance's decision making process. First, Gallagher disputes Reliance's narrow interpretation of "each and every." Gallagher argues that the common sense meaning of the Insuring Clause is that an applicant is totally disabled if he cannot perform *all* of the duties of his occupation. Thus, Gallagher maintains that "total disability" will result from the inability to perform even one material duty of an occupation. In the alternative, Gallagher contends that the language is at best ambiguous and, therefore, should be construed against the insurer and in favor of the insured.

It is certainly true that use of determiners such as any, all, each, and every can give rise to confusion. It is not surprising therefore that in certain instances courts have wrestled with the meaning of these terms. For example, in *McClure v. Life Ins. Co. of North America,* 84 F.3d 1129, 1134 (9th Cir.1996), the Ninth Circuit found that " '[e]very' can mean both 'all' (the entirety) and 'each' (the separate parts of the entirety)." Therefore, when used by itself, the word "every" can be

ambiguous. However, in the context of a disability claim, the Fourth Circuit has already interpreted "each and every" to mean "any." *Elliott v. Sara Lee Corp.,* 190 F.3d 601, 603–606 (4th Cir.1999). Consequently, this Court is constrained to find that under the terms of the Plan, Gallagher must demonstrate that he is unable to perform any material duties of the occupation.

Gallagher also objects to the use of the DOT descriptions as a measure of his occupation. Gallagher asserts that the DOT descriptions do not adequately approximate his actual occupation because they fail to account for his extensive travel schedule. Therefore, Gallagher contends that Hardy's vocational assessment is "fatally flawed" and, presumably, entitled to no weight. (Pl.'s Brf. in Support of S.J. at 28.)

■ The Court views the extent to which the Plan provides coverage for unique aspects of an insured's job as an open question. In addition, the Court finds that the reasonableness of a fiduciary's decision to resort to extracontractual points of reference, such as the DOT descriptions, in making a disability determination must be judged on a case-by-case basis. That being the case, the Court finds no abuse of discretion in Reliance's use of the DOT job descriptions in Gallagher's case. As Gallagher points out, the most salient difference between Gallagher's actual job and the DOT descriptions is that the DOT descriptions make no allowance for travel obligations. While travel may have been integral to Gallagher's actual position, it is clear that he performed other executive services, such as publishing, which did not require travel. Because Gallagher must be unable to perform any of his material duties, his inability to travel does not itself make him totally disabled.

Lastly, and most importantly, Gallagher asserts that the medical evidence unequivocally demonstrates that he is totally disabled, even under a narrow interpretation of the Plan. Gallagher urges the Court to give great weight to the opinions of his long-time treating physician and other health care providers who concur that Gallagher is totally disabled. Moreover, Gallagher contends that in making its decision Reliance ignored the debilitating effect of his chronic pain and focused instead on his physical ability to perform his job. Although his condition does severely limit his physical capacity, Gallagher contends that the pain also impairs his ability to think and reason and, therefore, his ability to perform the cerebral aspects of his job. Gallagher asserts that Reliance evaded this central issue and unreasonably focused its review on his physical capabilities.

In general, this Court is unimpressed with the scope of Reliance's review. Remarkably, Reliance chose not to employ an independent physician to review Gallagher's medical information, relying instead on the opinion of its own nurse. Predictably, she opined that Gallagher was capable of some unspecified amount of part-time work. Reliance has failed to supply any basis for her conclusion.

Additionally, the Court is shocked that Reliance's review focused exclusively on Gallagher's physical capability to perform sedentary work. Reliance's review was principally comprised of a point-by-point comparison of Gallagher's physical limitations and physical job requirements. However, Reliance does not dispute that Gallagher's job required more than the mere ability to sit at a desk, namely the ability to think, reason and use good judgment. Further, it does not contest, nor could it, that Gallagher's pain impairs his ability to concentrate and effectively perform his job. Therefore, Reliance abused its discretion by deciding not to consider these factors.

Moreover, the Court rejects Reliance's attempt to attach dispositive importance to whether Gallagher could produce evidence of a change in condition immediately prior to his resignation. Clearly, such an approach unfairly prejudices Gallagher for a good faith effort to maintain his employment in spite of his undisputed pain and limited physical ability. In addition, due to the degenerative nature of his condition, Gallagher cannot be expected to produce the type of definitive evidence of disability onset that might be readily available in other circumstances, such as when a beneficiary suffers a catastrophic injury. Thus, Gallagher's inability to identify an exacerbating event is not fatal to his claim and he is free to demonstrate disability through other competent evidence.

That is not to say that the issue of disability onset is unimportant. On the contrary, the Court finds it significant that Gallagher's evidence demonstrates that his ability to perform his job had been in steady decline. For instance, Father Bradley notes in his letter that Gallagher had been unable to maintain his employment despite GWP's repeated attempts to accommodate his condition. (Pl. at 218–19.) Accordingly, the Court finds that Gallagher produced evidence which should have satisfied an impartial decision-maker that he was disabled during the elimination period.

Lastly, the Court concludes that based on the administrative record, Reliance should have concluded that Gallagher was in fact disabled as that term is defined in the Plan. It is not disputed that Gallagher has suffered from chronic pain for a number of years. At some point, the global effect of pain can be so severe that it renders a person unfit for performing the

material duties of his job. Clearly, a physician's opinion is the best evidence for determining when and if an applicant has crossed the threshold of manageable pain.

Based on his condition during the elimination period, Gallagher's physicians and other health care providers uniformly concluded that he cannot or should not work at all, despite the fact that he retained some limited physical capabilities. Therefore, Gallagher has submitted satisfactory proof that his condition renders him totally disabled and he is eligible for long term disability benefits. The Court will enter an appropriate Order awarding benefits.

### III. Attorney's Fees and Prejudgment Interest

 Plaintiff seeks attorney's fees, costs, and prejudgment interest on unpaid benefits. ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C.A. § 1132(g)(1) (West 1999). In *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1028–29 (4th Cir.1993), the Fourth Circuit enunciated a five factor test to guide the district court's exercise in awarding attorney's fees under ERISA:

(1) degree of opposing parties' culpability or bad faith;

(2) ability of opposing parties to satisfy an award of attorney's fees;

(3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances;

(4) whether the parties requesting attorneys' fees against the opposing party sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5) the relative merits of the parties' positions. *Quesinberry*, 987 F.2d at 1029.

In the instant case, the second, third, and fifth factors weigh in Plaintiff's favor. However, it is clear that Reliance's reasonable belief that it held discretionary authority over the eligibility determination influenced everything it did with respect to the administration and litigation of these claims, including its decision not to have Plaintiffs examined by a physician. Nevertheless, the Court feels strongly that Reliance's review of Gallagher's claim was weak, and will award fees, costs, and prejudgment interest to Gallagher.

However, the Court requires more information from the parties concerning the total amount of judgment. Therefore, the parties will be directed to file briefs on fees, costs, and prejudgment interest.

### IV. Order

For the foregoing reasons, **IT IS ORDERED** that Plaintiff Patrick Gallagher's Motion for Summary Judgment be, and hereby is, **GRANTED** and Defendant Reliance Standard Life Insurance Company's Motion for Summary Judgment be, and hereby is **DENIED. IT IS FURTHER ORDERED** that Reliance will pay all benefits to Gallagher that he would have been entitled to had Reliance adjudicated his claim in his favor at the onset. **IT IS FURTHER ORDERED** that the parties will submit briefs on attorney fees, costs, and prejudgment interest, but that Gallagher will recover whatever the Court deems the total sum after reviewing the requested briefs.