**Karen L. WILLIS, Plaintiff,**

v.

**BAXTER INTERNATIONAL, INC., Administrative Committee of Baxter International, Inc.; and Continental Casualty Company/CNA Insurance Companies, Defendants.**

**No. 1:01CV53–C.**

United States District Court,
W.D. North Carolina.
Asheville Division.

Nov. 30, 2001.

Heather Newton, Dotson-Smith & Newton, Asheville, NC, for plaintiff.

Ingrid Blackwelder Erwin, Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, SC, for defendants.

## MEMORANDUM OF DECISION

COGBURN, United States Magistrate Judge.

**THIS MATTER** is before the court upon plaintiff's Motion for Summary Judgment and defendants' cross Motion for Summary Judgment. In support of and in opposition to such motions, the respective parties have submitted nearly 200 pages of legal arguments, in addition to the administrative record. A hearing was conducted in this matter, and counsel for the respective parties appeared and presented oral arguments. For the reasons discussed below, the court will grant plaintiff's Motion for Summary Judgment, deny defendants' Motion for Summary Judgment, reverse the decision of the plan administrator, and award plaintiff plan benefits. .

## I. Background

### A. Plaintiff's Work History

Plaintiff was a long-term employee of defendant Baxter International, Inc., ("Baxter") and worked on an assembly line as a packing inspector of intravenous fluid bags. Plaintiff's employment with Baxter began on April 23, 1979, and ended on March 8, 1999, with her last day of work being February 12, 1999.

At the time plaintiff left her employment with Baxter, she was 52 years old, had a high-school education, and had relevant work experience in manufacturing. The record is devoid of any determination of whether plaintiff had acquired any transferable skills.

### B. The Physical Demands of Plaintiff's Work

The administrative record contains plaintiff's own description of the physical demands of her job, in addition to a generalized description provided by her employer. Plaintiff states that her job required sitting in front of a conveyor belt with IV bags hanging down. If she saw a defective bag, she was required to pull it off the line; and if the machine stopped, she had to get up and restart it, which she said sometimes happened 100 times. Her duties also included cleaning the machine if it broke down. While inspecting bags, she was required to sit for long periods of time.

While plaintiff takes issue with the job description defendants cite in their October 11, 2000, denial letter, the court cannot find it to be incompatible with plaintiff's own description. The court notes that such generalized descriptions, usually excerpted from the *Dictionary of Occupational Titles,* are the preferred method of job description in disability determinations. The defendants described the physical demands of plaintiff's job, as follows:

> The claimant's job requires fine manipulation, simple grasping, pushing and twisting. Sitting for 6 hours standing for 1 hour and walking for 1 hour. It requires lifting constantly 0 to 10 pounds and carrying pushing and pulling for 1 hour from 1 to 10 pounds. The claimant's job falls within the light to medium category according to the Physical Demands. As categorized by the United States Department of Labor's Dictionary of Occupational Titles.

*See* Administrative Record, at 68. In *Gallagher v. Reliance Standard Life Ins. Co.*, 171 F.Supp.2d 594 (W.D.N.C.2001), the Chief Judge of this district, in addressing a similar disparity between the job as done by the claimant and as referenced by the employer, held, as follows:

> [T]he reasonableness of a fiduciary's decision to resort to extracontractual points of reference, such as the DOT descriptions, in making a disability determination must be judged on a case-by-case basis.

*Id.*, at 602. In *Gallagher*, the court found no abuse of discretion where the substantive difference in the actual job and the DOT description was the unique travel requirements. *Id.*, at 602. Here, the main difference is the distance plaintiff must walk to utilize plant facilities for personal reasons. While such aspects are important, they are ancillary to the actual work performed. Clearly, the description used by the defendants is broad enough to include the actual duties performed by plaintiff, including clearing and cleaning the machine. The court can find no abuse of discretion in utilization of the DOT.

### C. Plaintiff's Impairments

Defendants take issue with the alleged severity of plaintiff's ailments, the sufficiency of the objective medical documentation, and the impact of such conditions on plaintiff's ability to work; however, it is undisputed that plaintiff suffered from a number of impairments, all of which appear to stem from her morbid obesity. Plaintiff's documented medical conditions included fibromyalgia, arthritis, degenerative disk disease, sleep apnea, diabetes, superficial phlebitis, morbid obesity, bowel and bladder incontinence, chronic pain syndrome, a history of knee surgery and back surgery in 1998, and a history of cancer treated with radiation therapy.

### D. Impact of Impairments on Plaintiff's Work at Baxter

Plaintiff also submitted evidence of the impact of her medical impairments on her ability to perform her job duties. She stated that she had difficulty traversing the distances between her work station and the plant parking lot, cafeteria, and restrooms. She also stated she could hardly walk 100 feet without holding on to something and that the distances to restroom facilities often caused her to soil herself. Sitting for long periods, she said, aggravated the pain in her tailbone. She could not stand to see the bags, and she was very sleepy due to fibromyalgia. There is no evidence of record that contradicts plaintiff's subjective evidence concerning the impact of her impairments on her ability to perform her job as a packing inspector.

### E. Benefits Decisions

### 1. Short–Term Disability Claim

As to plaintiff's claim for short-term disability benefits, the plan defined "disability" to include the following elements:

(1) continuously unable to perform the substantial and material duties of her current job;

(2) be under the regular care of a licensed physician; and

(3) not be gainfully employed in any occupation for which she is or became qualified by education, training or experience.

The plan provided that the plaintiff had the burden to produce "substantial objective medical information or clinical findings with your medical treatment to support the diagnosis of a disabling condition," and upon satisfying such burden, the plan would pay to plaintiff "benefits until you . . . are no longer able to provide sufficient evidence of your disability."

Plaintiff received an award of short-term disability benefits for a closed period of disability between March 22, 1999, and May 10, 1999, with a 21–day elimination period, based on "right knee effusion only." All other applications for short-term disability were denied, citing a lack of "objective medical documentation to support a continuing condition of such severity, which would prevent you from performing the essential duties of your occupation." The plan administrator further opined that the claim was denied because of a lack of objective medical evidence that would support plaintiff's subjective evidence of the disabling impact of her impairments, and the administrator defined the requirement of objective medical evidence, as follows:

> Objective medical evidence means findings that are supported and confirmed by medically acceptable diagnostic techniques that show the existence of a medical impairment that results from a physical or psychological abnormality.

Administrative Record, at 85. With some minor gaps, which are not significant, plaintiff has referenced evidence contained in the administrative record where a series of doctors had "written her out of work" since February 1999. The medical evidence submitted in support of plaintiff's claim has been reviewed by the court and found to be extensive. Review of the record indicates that while the ultimate decision was made by a committee selected by the employer, such decision was premised upon findings made by a registered nurse claims manager for the carrier. *See* Administrative Record, at 15 & 23–25.

### 2. Long–Term Disability Claim

In addition to short-term benefits, plaintiff was also eligible to apply for long-term disability benefits. Under the terms of the long-term disability plan, a claimant was considered disabled during the first 12 months of eligibility if she was under the regular care of a licensed physician, continuously unable to perform the substantial and material duties of her regular occupation, and was not working for wages in any occupation for which she was or became qualified by education, training and experience. After the first 12 months of eligibility, the plan considered a claimant "disabled" if she was under the regular care of a licensed physician; was, because of illness or injury, continuously unable to engage in any occupation for which she was or became qualified based on her education, training, or experience; and was not working for wages in any occupation for which she was or became qualified by education, training and experience.

Notably, the long-term disability plan differs from the short-term plan by not requiring "substantial objective medical information or clinical findings." Instead, it provides that it "pays benefits until you … are no longer able to provide sufficient evidence of your disability."

Plaintiff applied for long-term disability benefits based on a disability date of February 15, 1999. The long-term plan had a 196–day elimination period, making plaintiff eligible to apply for such benefits in August 1999. Plaintiff applied for benefits in July 2000, and benefits were denied by letter dated October 11, 2000. Her appeal was denied by way of letter dated February 22, 2001, which stated:

> [T]he evidence presented did not support loss with functional impairment continuously during the short-term claim extending into the elimination period of the long-term policy and beyond.

On behalf of the appeals committee, a claims consultant for the carrier stated in a letter, as follows:

> We are not disputing the presence of her medical condition(s), and fully acknowledge and appreciate the medical evidence that indicates the various treat-

ment modalities involved in her care. And, we are aware that someone with her diagnoses has the potential for the exhibited symptoms of these illnesses to cause impairment in their functionality. However, the evidence presented did not support loss with functional impairment continuously during the short-term claim period extending into the elimination period of the long-term and beyond. *See* Administrative Record, at 8.

In support of her claim for long-term disability benefits, plaintiff submitted all the material she had submitted in support of her short-term claim (discussed *infra*) and additional medical/vocational information. Included in her submission was a report from Maggie Thomas, a consultant with Kelly Independent Rehabilitation Services. Ms. Kelly had a B.A. in psychology, an M.Ed. in Rehabilitation Counseling, and 25 years of experience in the field of vocational rehabilitation. She interviewed plaintiff personally, reviewed all medical records which were then before the plan administrator, and entered her information in the OASYS job search computer program for analysis. Ms. Kelly concluded, as follows:

> [B]ecause of her multiple medical problems, Ms. Willis is unable to sit, stand or walk for even moderate periods of time due to cervical, lumbar and knee difficulties. As stated by Dr. Summers, the fibromyalgia alone is not a disabling condition but in conjunction with back and knee pain and weakness, sleep disturbances, and bowel and bladder incontinence, Ms. Willis would not be able to obtain and maintain gainful employment. Ms Willis could not sustain an 8 hour day because of these medical conditions.

Administrative Record, at 30–32. Ms. Kelly utilized the OASYS job search program to search for alternative positions for plaintiff. In short, Ms. Kelly was unable to identify any job which plaintiff could perform with her combined medical conditions.

In addition to such vocational evidence, plaintiff submitted evidence of sleep disturbance, which was evaluated at Mission + St. Joseph's Hospital. Plaintiff was diagnosed with "mild yet clinically significant REM sleep-related obstructive sleep apnea disorder." Administrative Record, at 271.

### 3. Social Security Disability Claim

■ The administrative record contains materials that indicate that plaintiff's application for Social Security disability benefits was granted and that defendants were aware of that decision. While the court agrees as a matter of law with defendants' argument that the plan administrator is not bound by such decision, the information is relevant because, as this court is most aware, the standards applied by the Commissioner of Social Security in determining whether an applicant retains the residual functional capacity to perform *any* gainful employment are *at least* as restrictive as the plan standards in this case. Indeed, as this court has stated in previously published decisions, the case law that has developed in Social Security cases is most instructive in ERISA disability claims. Even though a plan administrator need not give deference to, or even consider, the ultimate vocational determination of the Commissioner of Social Security, failing to do so would be at the administrator's peril. Although those determinations are not infallible, federal courts are keenly aware of the close scrutiny which claims for Social Security disability benefits receive.

## II. Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues

for trial. Upon the moving party's meeting that burden, the nonmoving party has the burden of persuasion to establish that there is a genuine issue for trial.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving [sic] party, there is no "genuine issue for trial."

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted; emphasis in the original) (quoting Fed.R.Civ.P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In this case, the parties have submitted cross motions for summary judgment, wherein each side contends that there are no issues for trial and that judgment may be rendered as a matter of law. Finding that the facts are adequately presented in the administrative record, that the court's review is limited to the administrative record that was before the plan administrator, and that no genuine issues of material fact exist, summary judgment is an appropriate means to resolve the issues presented.

## III. Discussion

### A. Standard of Review

■ Where a plan administrator is granted discretionary authority by the terms of the plan to determine eligibility or to construe the terms of the plan, the denial of benefits must be reviewed for abuse of discretion. *See Firestone Tire*

*and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

Under this deferential standard, the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently.

*Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228, 232 (4th Cir.1997). In determining whether discretion has been abused, the Court of Appeals for the Fourth Circuit has identified the following eight factors for consideration by a reviewing court:

(1) the language of the plan;

(2) the purposes and goals of the plan;

(3) the adequacy of the materials considered to make the decision and the degree to which they support it;

(4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan;

(5) whether the decision-making process was reasoned and principled;

(6) whether the decision was consistent with the procedural and substantive requirements of ERISA;

(7) any external standard relevant to the exercise of discretion; and

(8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal–Mart Stores, Inc. Associates Health and Welfare Plan,* 201 F.3d 335, 342–43 (4th Cir.2000). As will be discussed below, factors three and five through eight have caused this court a great deal of concern about the administrative decision. Further, this court references below "external standards" that have been developed in Social Security disability determinations and finds, *infra,* the decision of the fiduciary to be wanting.

■ Under ERISA, a plan fiduciary is obligated to act "solely in the interest of the participants and beneficiaries." 29

U.S.C. § 1104(a)(1). ERISA anticipates that conflicts of interest are inherent in benefit determinations and provides that such conflicts be considered as a factor in determining whether there was an abuse of discretion by a plan's administrator and fiduciary. *Id.,* at 233. Where a conflict is shown, the deference to the decision of the fiduciary "will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Id.*

> The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

*Id.* Where, as here, it is satisfactorily shown that the decision maker has a financial interest that conflicts with its duties as a plan fiduciary, the "abuse-of-discretion" standard is modified on a sliding scale to counterbalance such impact:

> When a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

*Bedrick v. Travelers Ins. Co.,* 93 F.3d 149 (4th Cir.1996) (citations omitted). The modified abuse-of-discretion standard requires close judicial scrutiny of the plan administrator's decision. *Holder v. Woodmen of the World,* 2001 WL 369680 (4th Cir.2001); *Doe v. Group Hospitalization & Medical Services,* 3 F.3d 80, 82 (4th Cir. 1993).

■ In this case, plaintiff has satisfactorily shown the probability of a conflict of interest, inasmuch as the decision makers were both fiduciaries under the plan and employees and/or agents of the employer and carrier who ultimately would have been required to foot the bill had a decision favorable to plaintiff been rendered. Indeed, it appears from the record before the court that the moving force behind both the short-term and long-term denials was a registered nurse, who worked full time for the carrier defendant in what appears to be a role of claims adjustor. In *Gallagher, supra,* the district court, faced with a nearly identical situation, held, as follows:

> In general, this Court is unimpressed with the scope of Reliance's review. Remarkably, Reliance chose not to employ an independent physician to review Gallagher's medical information, relying instead in the opinion of its own nurse. Predictably, she opined that Gallagher was capable of some unspecified amount of part-time work. Reliance has failed to supply any basis for her conclusion.

*Id.,* at 603. The committee, which made the ultimate determination, was equally conflicted, inasmuch as its members were also employees or agents of the company or carrier that would ultimately foot the bill if a determination favorable to plaintiff was rendered. (The evidence of record reveals that under the benefits package, the employer would pay and decide short-term disability claims, which appear to have a one-year exposure, and the carrier would pay and decide long-term claims.) The court, therefore, will apply a modified abuse-of-discretion standard.

## B. Scrutiny of the Administrative Decision

While a great deal of information has been provided to this court by both sides, the court has focused on whether there was an abuse of discretion by the fiduciaries in the decision-making process. In such analysis, the court has assessed whether the decision makers considered plaintiff's impairments in combination, whether the decision makers' interpretation of the "objective medical proof" provided by plaintiff in accordance with the plan was within the realm of reason, whether the decision makers improperly substituted their own unqualified medical judgment for the judgment of plaintiff's treating physicians (all of whom were clearly qualified), and whether the decision makers improperly discredited professional medical opinions based on a mistrust of plaintiff's oral history. In order to scrutinize the plan administrator's decision, the court has closely reviewed the administrative record.

As to both her claims for short-term and long-term disability benefits, plaintiff presented to the plan administrator a great deal of objective medical justification. The record reveals that Dr. Sean Maloney, a specialist in physical medicine, first examined Ms. Willis on March 22, 1999, which was a month after she left work. His findings included severe fibromyalgia, which he related to plaintiff's neck, shoulders, low back, and hips; chronic severe low back and leg pain associated with degenerative disk disease of the lumbar spine; a history of bowel and bladder incontinence following radiation therapy for cervical cancer; adult onset diabetes, poorly controlled; degenerative disk disease of the cervical spine, with previous cervical diskectomy and fusion in 1998; degenerative arthritis of both knees, with previous arthroscopic surgery of the right knee in June 1998; severe obesity (height 5'8", weight 300+ lbs); and sleep disturbance, with marked aerobic deconditioning. Dr. Maloney scheduled x-rays, an MRI of the lumbosacral spine, an EMG and nerve conduction study of the back and lower extremities, and blood work, including a Thyroid Profile for her next scheduled visit in April. At the conclusion of the March 22, 1999, visit, he instructed plaintiff to "remain out of work" until her next visit.

On April 15, 1999, plaintiff returned to Dr. Maloney for electro-diagnostic evaluation of the low back and lower extremities to look for any evidence of lumbosacral radiculopathy, lumbosacral plexopathy, or other acute neuropathy. Her MRI scan of the lumbar spine noted a small to medium size focal left paracentral and foraminal disk protrusion or bulge with mild narrowing of the left foramen at the L3,4 vertebral level. It noted mild congenital and acquired spinal stenosis at the L4,5 vertebral level and some degenerative disk disease, with mild midline disk protrusion at L5/S1. R. 141–42. Dr. Maloney recorded that plaintiff's legs had been doing somewhat better since she had been resting at home and out of work. She had also been seen by Dr. Tauber, an endocrinologist, who was beginning more aggressive treatment of her diabetes.

Blood work drawn to look for perpetuating factors for myofascial pain and dysfunction revealed a hemoglobin A–1–C level of 9.7 and a glycolated hemoglobin level of 12.7, which were both abnormal.

Dr. Maloney reviewed nerve conduction studies of the right and left peroneal and tibial nerves and right and left sural and superficial peroneal sensory nerves. He noted several abnormalities, including a prolonged peroneal nerve distal latency in the right leg; asymmetrical peroneal nerve F wave latencies, with the left prolonged with respect to the right side and with respect to normal; tibial nerve F wave

latencies which were at the upper limits of normal or mildly prolonged, with absent H reflexes, bilaterally; absent right and left superficial peroneal nerve sensory evoked responses; and an absent left sural sensory nerve evoked response. Right sural sensory nerve distal latency was at the upper limits of normal, with a sensory evoked response toward the lower limits of normal.

An EMG revealed no evidence of acute muscle membrane instability suggestive of an acute lumbosacral radiculopathy, brachial plexopathy of other acute peripheral neuropathy. It did note chronic changes of increased motor unit phasicity, which are nonspecific, but can be seen in patients with diabetes mellitus, chronic myofascial syndromes, and degenerative disk disease of the lumbar spine. Dr. Maloney's assessment on April 15, 1999, was that the EMG and nerve conduction study was abnormal, but consistent with a diffuse neuropathic process, and he opined that the changes on nerve conduction study may be the result of both diabetes mellitus, which was not well controlled, as well as a postradiation pelvic neuropathy.

Dr. Maloney's plan on April 15, 1999, was for plaintiff to remain out of work for at least the next six weeks, until he could reevaluate her. She was to continue to rest, as well as do as much aerobic exercise as she could tolerate. He also prescribed pain medication.

Dr. Maloney saw plaintiff on June 2, 1999, and September 7, 1999, and reiterated his assessment of chronic, severe, myofascial pain syndrome or fibromyalgia involving muscles of the neck, shoulders, back, and hips associated with diabetes and obesity, and severe neck and low back pain associated with degenerative disk disease of the cervical and lumbar spines. He noted her intolerance for walking. His plan was for her to continue controlling her diabetes, exercise as much as she could tolerate, and follow up with her neurologist, Dr. Rhoton, who had prescribed epidural blocks for her pain.

On August 9, 1999, the Social Security Administration found Ms. Willis to be disabled and eligible for Social Security benefits as of February 15, 1999. In a letter of May 9, 2000, which was intended for consideration by the plan administrator, Dr. Maloney stated his agreement with the Social Security disability determination:

> I have reviewed the job description of her packing inspector job at Baxter Health Care.... It is my opinion that Ms. Willis is currently 100% disabled from doing any type of even sedentary-type work due to her multiple medical problems including severe low back and lower extremity pain and weakness. She requires frequent rest during the day, including lying down, for treatment of fatigue and pain. Ms. Willis is currently on Social Security Disability which became effective in August of 1999 and I concur with the decision of the Social Security Administration that she is unable to perform even sedentary work.

On July 14, 1999, the Social Security Administration referred plaintiff to Dale Fetzer Mabe, D.O., at Swannanoa Medical Center, for an evaluative examination. Dr. Mabe did a functional assessment based on a history plaintiff provided to him. Dr. Mabe found that Ms. Willis could sit for 30 minutes without pain in her tailbone, stand for five minutes without pain in her tailbone, walk for five minutes without pain in her low back, and lift and carry less than 20 pounds. Dr. Mabe's impression, based on Ms. Willis's medical history and prior medical records, was degenerative disk disease, non-insulin dependent diabetes, fibromyalgia with 15 out of 18 tender points, irritable bowel syndrome, and bilateral

knee pain post arthroscopic surgery on the knee in June 1998.

On March 1, 1999, two weeks after leaving work, plaintiff also presented to Dr. Laura Summers, a rheumatologist. Dr. Summers confirmed the diagnosis of severe fibromyalgia, but also stated that "fibromyalgia alone is not a disabling condition, and therefore, it is not a reason for disability." Dr. Summers did not, however, consider plaintiff's other severe impairments in combination with the diagnosis of fibromyalgia.

In addition to the specialists to whom plaintiff was referred or she sought out, plaintiff was also followed by her family physicians, Drs. Atkinson and Cunningham. See Administrative Record R. 113–124, 233–251. On February 15, 1999, Dr. Atkinson noted plaintiff's complaints of sharp pain in her right lower leg, pain in multiple joints of toes, numbness in her feet, and swelling in her left leg. He noted no evidence of deep vein leg thrombosis. At a follow-up visit on February 18, 1999, Dr. Atkinson noted a worsening of plaintiff's pain. During his physical examination of plaintiff, he noted pain in her left leg superior to medial malleolus with a small bluish discoloration, that appeared to be a dilated vein, and palpable varicosities, firmness in calves bilaterally, greater on left, Homan's sign equivocal, and mildly painful. He ordered a Venous Doppler test.

On February 25, 1999, Dr. Cunningham saw plaintiff for worsening pain in her left leg. She reported she was having trouble doing her job at Baxter. Dr. Cunningham assessed superficial thrombophlebitis and left leg pain.

Dr. Cunningham saw her again for follow-up on March 3, 1999, at which time she again complained of pain, weakness, and fatigue that interfered with her ability to work. On March 9, 1999, he saw plaintiff, who again complained of fatigue and stated that she could not work. Dr. Cunningham wrote her out of work through March 22, 1999, so that she could be seen by Dr. Sean Maloney.

On June 22, 1999, Dr. Cunningham saw Ms. Willis for multiple problems, and she informed him that CNA had denied her disability for February 1999. He told her to have the insurance company call him because that was the period during which she was suffering from superficial thrombophlebitis.

Prior to her alleged onset date of disability, neurologist Dr. Eric Rhoton performed a diskectomy and fusion at C5–C6 on September 10, 1998, six months before she ceased work. After February 15, 1999, he saw her on June 2, 1999; June 30, 1999; August 20, 1999; October 6, 1999; December 12, 1999; and February 9, 2000. He advised her to remain out of work from June 2, 1999, through October 6, 1999, due to lumbar pain. His impressions were lumbar degenerative disk disease, radicular pain, and chronic pain syndrome. Objective tests were normal, except that sensory examination revealed reduced sensation in her lower extremities, due to diabetes or history of radiation therapy for cancer. Dr. Rhoton treated her with a series of epidural injections, which provided temporary pain relief. Diabetes and obesity made her other option—further surgery—risky.

Plaintiff's diabetes was followed during the period of disability by Dr. Stewart Tauber.

She underwent physical therapy and attended the pain program at Thoms Rehabilitation Hospital. Although her therapists noted improvement with pool therapy, plaintiff quit that program shortly before leaving Baxter.

Orthopaedic surgeon Dr. James Wheeler performed surgery on plaintiff's right knee

in June 1998, eight months before she ceased work. She saw him for pain in the knee on January 8, 1999, and returned to him for arthritis and a possible meniscal tear in her left knee in 2000, which he treated with cortisone shots.

### C. Plaintiff's Assignments of Error

Plaintiff contends that defendants abused their discretion in denying her benefits, and she specifically contends that they

i. interpreted plan language in a manner inconsistent with the purposes of the plan by imposing a higher standard for her proof of claim than the plan language required;

ii. disregarded the findings, impressions and opinions of her treating physicians in favor of the conclusions of their in-house nurse case manager, without having a licensed physician review the claim file; and

iii. failed to consider the combined effects of plaintiff's many medical conditions on her ability to work and, instead, considered her conditions only individually and in isolation.

### D. Discussion

The court agrees with defendants on a number of issues: that they are under no obligation, under the terms of the plan, to give any deference to the decision of the Commissioner of Social Security; that they are not required to have a medical doctor conduct a claims review; and that a registered nurse can assist in the claims review process.

While the terms of the plan govern and afford the plan administrator great leeway in determining plan terms, the question for the court is whether the administrators and fiduciaries abused their discretion in the context of a sliding-scale review, which comes down to whether plaintiff received a full and fair review. 29 U.S.C. § 1133(2)(a claimant must be allowed "a full and fair review by the appropriate named fiduciary of the decision denying the claim."); *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154 (4th Cir.1993)(failure to provide "full and fair review" amounts to abuse of fiduciary discretion).

As it has in previous ERISA disability cases, this court has looked to the well-developed principles in this circuit that govern review of final decisions of the Commissioner of Social Security. Just like the plan in this case, the regulations which govern the processing of Social Security claims do not require the adjudicator to be a medical doctor; no deference is given to disability determinations by private insurers; and nurses assist in the processing of claims.

Close review of the record reveals that defendants rejected plaintiff's claim, both initially and upon reconsideration, based on what they perceived as a lack of objective medical evidence documenting plaintiff's claim. In making such finding, the decision maker rejected a substantial amount of plaintiff's medical evidence; considered each impairment (and the supporting medical evidence) in isolation; discredited plaintiff in her personal accounts of the disabling effects of her impairments, both directly and indirectly [1]; and required objective medical proof of subjective impairments, such as pain, without considering the impact of such pain on plaintiff's daily activities.

A great deal of argument has been devoted to the opinion of one of plaintiff's

---

1. It appears that defendants gave little credence to the findings of an independent medical evaluation ordered by the Social Security state agency, apparently discrediting the report because plaintiff presented her own history of how her ailments impaired her day-to-day life.

physicians that fibromyalgia, standing alone, is not a disabling condition. This court has rejected a great number of Social Security appeals, but not all, that were based only on a clinical finding of fibromyalgia. Rather than focus on fibromyalgia, this court has attempted to review the totality of the medical evidence in conducting this review. It is consideration of the full panoply of ailments and their combined impact on capacity for work that is important, as appellate courts have consistently found:

> Each illness standing alone, measured in the abstract, may not be disabling. But disability claimants are not to be evaluated as having several hypothetical and isolated illnesses. These claimants are real people and entitled to have their disability measured in terms of total psychological well being.

*Layton v. Heckler*, 726 F.2d 440, 442 (8th Cir.1984). Review of the record and arguments reveals that the plan administrators never considered plaintiff's ailments in combination. It is apparent that plaintiff was suffering from a combination of severe impairments that, when considered together, would prevent her from doing even a sedentary job, much less her work which fell in the light-to-medium range.

 Absent a showing of vocational expertise, courts, as well as disability adjudicators, give little deference to the opinions of medical doctors on the ultimate determination of "disability." While many doctors are willing to sign letters drafted by attorneys that the patient/client is completely disabled, those opinions carry little weight, and the discussions in the pleadings concerning whether a doctor did or did not find plaintiff to be disabled are not critical to decision. It is a doctor's medical findings, however, that are most helpful in determining what impairments are interfering with the plaintiff's ability to work. Indeed, such medical information is most informative on the issue of severity of the impairments. To that end, it is an abuse of discretion to reject the medical opinions of a treating physician unless the adjudicator can point to persuasive contradictory medical evidence. *Mitchell v. Schweiker*, 699 F.2d 185 (4th Cir.1983).

> Objective medical facts and the opinions and diagnoses of the treating and examining doctors constitute a major part of the proof to be considered in a disability case and may not be discounted ....

*Id.*, at 187. A treating physician is a physician who has observed the plaintiff's condition over a prolonged period of time. *Id.* The opinion of a treating physician may be disregarded where it is inconsistent with clearly established contemporaneous medical records. *See* 20 C.F.R. § 404.1527(d)(4). The administrative record in this matter is replete with objective medical findings from plaintiff's treating physicians, and it is apparent that defendants rejected such opinions without ordering an independent medical examination, which they certainly could have done under the plan, or utilizing a medical expert to scrutinize the records. The only conclusion that the court can draw is that defendants relied upon the opinion of an in-house registered nurse, who apparently never saw or treated plaintiff, in the face of medical evidence that clearly shows that plaintiff was totally disabled.

 In this case, the administrative record reveals an extensive medical history of severe impairments, including, but not limited to: multiple surgeries that predate, but which are in close temporal proximity to, the onset of disability; and diagnoses of degenerative diseases, which were all connected to plaintiff's medically documented morbid obesity and adult onset diabetes. In *Gallagher*, *supra*, the district court held, as follows:

It is not disputed that Gallagher has suffered from chronic pain for a number of years. At some point, the global effect of pain can be so severe that it renders a person unfit for performing the material duties of his job. Clearly, a physician's opinion is the best evidence for determining when and if an applicant has crossed the threshold of manageable pain.

*Id.*, at 603–04. On the other hand, there are no relevant contemporaneous medical records that would justify the wholesale rejection of the opinions of plaintiff's treating physicians.

The findings of the consultative examiner are consistent with the opinions of plaintiff's treating physicians, which, in turn, are supported by extensive clinical findings and by the administrative record in this case. In rejecting the opinion of the consultative examiner, the defendants must have based such decision on a disbelief of the veracity of plaintiff. In *Hatcher v. Secretary*, 898 F.2d 21, 23 (4th Cir.1989), the Court of Appeals for the Fourth Circuit held that a disability adjudicator

is required to make credibility determinations—and therefore sometimes make negative determinations—about allegations of pain or other nonexertional disabilities.... But such decisions should refer specifically to the evidence informing the ALJ's conclusion. This duty of explanation is always an important aspect of the administrative charge, ... and it is especially crucial in evaluating pain, in part because the judgment is often a difficult one ....

*Id.* (quoting *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir.1985) (citations omitted)). The plan administrator does not reference any specific, relevant evidence that would support not fully crediting plaintiff. Based upon the record that is before this court and was before the administrator, there is no reason to believe that plaintiff has exaggerated her claim or has been untruthful with anyone.

The court has also considered the plan administrator's decision to require objective medical proof not just of the claim, but also of subjective symptoms, such as pain, without any regard for the impact of such pain on the activities of plaintiff's daily life. The battle in this circuit over a "pain standard" was long and hard fought and ultimately resulted in a decision favorable to claimants and costly to the Social Security Administration. Whether pain or other subjective symptoms are reviewed in the context of a private or public scheme of insurance, there is little doubt but that the method for reviewing claims of pain will follow the decision of the Court of Appeals for the Fourth Circuit in *Hyatt v. Sullivan*, 899 F.2d 329 (4th Cir.1990)(*Hyatt III*), in which the court held, as follows:

Once an underlying physical or mental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree, can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motory disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

*Id.,* at 336. The progeny of *Hyatt III* spawned *Mickles v. Shalala,* 29 F.3d 918 (4th Cir.1994), in which Honorable K.K. Hall, Circuit Judge, announcing and concurring in the judgment of the Court of Appeals for the Fourth Circuit, held:

> This refreshing mode of analysis is precisely what I believe our cases have been striving for. The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life.

*Id.,* at 921. This is not to say that medical evidence is not pertinent to determining the vocational impact of pain. As the district court found in *Gallagher, supra,* "a physician's opinion is the best evidence for determining when and if an applicant has crossed the threshold of manageable pain." *Id.,* at 604. The record contains ample documentation of a multitude of severe medical conditions that would support complaints of disabling pain. What is missing from the record is not medical evidence, as the plan administrators determined. Instead, the record is nearly devoid of evidence concerning the activities of plaintiff's daily life, especially a comparison between her daily activities before and after the onset date. It was an abuse of discretion to reject plaintiff's disability claim based on a lack of objective medical proof of pain, because the record contained ample evidence from which a reasonable and impartial adjudicator would have found just such supporting evidence.

## IV. Conclusion

The administrative record is replete with evidence which supports plaintiff's claims of short-term and long-term disability up to the point of decision. This court finds that defendants abused their discretion by rejecting her claims in a manner that was inconsistent with accepted and well-reasoned methodologies for evaluating disability claims, especially claims of pain. Plaintiff produced evidence which would have satisfied an impartial decision maker of her total disability.

The court will grant plaintiff's motion for summary judgment, award back benefits allowed by the terms of the plans for both short-term and long-term disability up to the date of decision, and award future long-term disability benefits payable monthly from decision. Such award of future benefits, however, is dependent upon plaintiff's annual satisfaction of any continuation provision of the plan, which may include an independent medical examination.

As to an award of attorneys fees, 29, United States Code, Section 1132(g)(1) provides for fees to a party that prevails on a significant issue; however, current case law from the Court of Appeals for the Fourth Circuit requires consideration of five factors:

(1) degree of opposing parties' culpability or bad faith;

(2) ability of opposing parties to satisfy an award of attorney's fees;

(3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances;

(4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5) the relative merits of the parties' positions.

*Martin v. Blue Cross & Blue Shield of Virginia, Inc.,* 115 F.3d 1201, 1209–10 (4th Cir.1997) (citing *Denzler v. Questech, Inc.,* 80 F.3d 97, 103 (4th Cir.1996)). There is, however, insufficient evidence of record to make such decision at this point. The court, therefore, will withhold entry of a judgment on this matter for 10 days, dur-

 

ing which time respective counsel should meet and discuss the actual dollar amount of back benefits, a plan for annual reviews, and whether attorneys fees are appropriate in this matter, and then communicate such to the court.

While this is a favorable decision for plaintiff, this court will point out to her that the award will be short lived if she does not take the advice of her physicians and engage in an appropriate exercise program and lose weight. The court is genuinely concerned with plaintiff's health, and it is apparent that decades will likely be cut from her life if she fails to heed such advice. Plaintiff's goal should not be to continue on disability for the remainder of her life, but to restore her health and return to a productive life. Clearly, the work history of this plaintiff indicates that she is diligent and has no fear of hard work; with this matter behind her, plaintiff should consider her job to be working on her health and eventually returning to work.

Finally, the court appreciates the fine manner in which respective counsel have managed this case and thoroughly briefed the issues.

### ORDER

**IT IS, THEREFORE, ORDERED** that plaintiff's Motion for Summary Judgment be, and hereby is, **GRANTED**, and that defendants' Motion for Summary Judgment be, and hereby is **DENIED.**

**IT IS FURTHER ORDERED** that defendants will pay all benefits to plaintiff that she would have been entitled to had defendants adjudicated her claim in her favor as of the date of onset.

**IT IS FURTHER ORDERED** that the parties will submit briefs on attorney fees, costs, and prejudgment interest, limited to 10 pages per side, not later than 10 days hence, and after consideration of such briefs, the court will reduce its conclusions to judgment.