**Wanda P. AUSTIN, Plaintiff,**

v.

**CONTINENTAL CASUALTY COMPANY, Defendant.**

**No. 1:01–CV–187–C.**

United States District Court, W.D. North Carolina, Asheville Division.

Aug. 23, 2002.

Eleanor MacCorkle, Asheville, NC, for Plaintiff.

Robert A. Sar, Sheri L. Roberson, Ogletree, Deakins, Nash, Smoak & Stewart, Raleigh, NC, for Defendant.

## MEMORANDUM OF DECISION

COGBURN, United States Magistrate Judge.

**THIS MATTER** is before the court upon plaintiff's Motion for Summary Judg-ment and defendant's cross Motion for Summary Judgment. In support of and in opposition to such motions, the respective parties have submitted concise memoranda of law and a well-organized administrative record. For the reasons discussed below, the court will grant plaintiff's Motion for Summary Judgment, deny defendant's Motion for Summary Judgment, reverse the decision of the plan administrator, and award plaintiff plan benefits.

### I. Background

#### A. Plaintiff's Work History, Impairments, and Medical/Vocational Record

Plaintiff was a long-term employee of Baxter International, Inc., ("Baxter"), working on a sub-assembly line for nearly 24 years. While she had a high-school education, she possessed no greater than fourth-grade skills in reading and comprehension and was limited to second-grade level in her math skills.

Plaintiff purchased from her employer, Baxter, a long-term care insurance plan, which was provided and administered by defendant herein. Plaintiff has suffered from diabetes mellitus since she was 11 and became insulin dependent two years before she ceased working in 1999. In addition to diabetes, plaintiff has also suffered from a progressive neck disorder, which began in 1987, and was followed by her family doctor. By 1989, the pain from her neck disorder had worsened, and she was referred to an arthritis specialist by her family doctor, who noted that plaintiff's pain was interfering with her work-related activities. After that referral, her family doctor diagnosed cervical arthritis with a component of fibromyalgia.

In early 1999, plaintiff's family doctor referred her to an orthopedic surgeon, who noted that plaintiff had a 10–to–12–year history of progressive neck and shoulder

pain and reported that her neck pulled to the left, causing spasms and pain when she resisted such pulls. He also noted aggravation of the condition upon bending, lifting, walking, or staying in one position and improvement when plaintiff was allowed to change positions at will. She reported pain at the 10 level.

Objective evaluation by the orthopedic surgeon resulted in a probable diagnosis of spasmodic torticollis, but that process was hampered by less-than-optimal x-ray films caused by plaintiff's inability to move her neck. Based upon such diagnosis, the orthopedic surgeon referred plaintiff to a neurologist.

The neurologist noted that plaintiff suffered from "grossly apparent" spasmodic torticollis. He noted that plaintiff had constant head tilt to the left, with the left shoulder slightly raised. He concurred in the earlier diagnosis, recommended botulism toxin treatment for the spasms, and referred plaintiff to another neurologist for that treatment.

The second neurologist concurred in the diagnosis. He noted that he was surprised that plaintiff had been able to work for 12 years with the condition and agreed with plaintiff to withhold any determination as to her ability to work until he saw how she responded to the injection therapy. Plaintiff's initial response was poor, and after several months, her neurologist concluded that her condition was significant and opined that it would be "very difficult for her to work on a production line at any facility."

The second neurologist also issued an opinion letter as to the functional limitations caused by plaintiff's disease. He stated that the disease made it very difficult for her to sit for very long periods of time and that she could not raise her hands above her head, lift, or perform rapid movements of the upper extremities. Even after repeated treatments, such treating physician determined that her condition was permanent and there was no real prospect of her returning to work.

In addition to the insulin-dependent diabetes and spasmodic torticollis, plaintiff developed retinopathy changes in both eyes, with advanced peripheral retinal ischemia, secondary to diabetes, in 2000. Her eye problems were treated by another physician through photo coagulation and panretinal photo coagulation. Plaintiff was also diagnosed with cervical dystonia, which is the apparent cause of the involuntary head turning, as opposed to the torticollis, which caused plaintiff's spasms.

Plaintiff also underwent a vocational evaluation by a certified vocational evaluator ("VE"), who, through testing, made the educational determinations discussed earlier. After considering plaintiff's age, medical conditions, vocational history, and level of pain, the VE determined that plaintiff was "very limited vocationally due to her low academic functioning," even before the functional limitations caused by her medical problems were considered. When her functional limitations were combined with her diminished access to the labor market, the VE determined that plaintiff was unable to meet the critical demands of competitive employment. He explained his determination, finding that plaintiff was unable to

(1) concentrate on tasks;

(2) maintain persistence or pace;

(3) maintain attendance and punctuality;

(4) carry out tasks in a timely manner; and

(5) complete a workday or workweek without an unreasonable number of breaks related to her symptoms.

**B. Responsive Evidence Developed By Defendant**

In determining whether plaintiff was entitled to continued benefits after her short-

term benefits expired, defendant developed evidence from independent [1] experts. In making its determination that plaintiff was not entitled to long-term disability benefits, the defendant hired a vocational consultant, who conducted a personal interview with plaintiff, but no vocational testing, and a medical expert, who conducted no independent medical examination, only a records review.

The report of defendant's vocational evaluator indicated that plaintiff was wearing a foam neck collar and that her head leaned toward her right shoulder, but never fell onto her shoulders. The evaluator stated that she never observed plaintiff twitching. In addition, she noted that plaintiff had a high-school education with no further training and that plaintiff believed she could not do any work due to her condition and that she experienced pain with the least activity. In addition to conducting no tests, the evaluator made no determinations concerning plaintiff's residual functional capacity. The evaluator did note that plaintiff got out of her sports utility vehicle without difficulty and talked with the evaluator for 65 minutes without noticeable trouble.

Plaintiff was also interviewed by one of defendant's vocational case managers. In that interview, plaintiff discussed her activities of daily living. She reported that relatives did her shopping, cooking, and cleaning, and that she mostly sat or laid down and did some walking. After reviewing plaintiff's medical records and the functional limitations her doctors had given her, the interviewer concluded that plaintiff could perform the tasks of telephone operator, telemarketer, and dispatcher. There is no evidence that, in making that determination, this vocational case manager considered plaintiff's education or cognitive skills.

Defendant also caused to be conducted a consultative medical examination, only the consulting physician never saw plaintiff and only reviewed medical records and vocational records sent to him by defendant. It is of significance that this consulting doctor noted that plaintiff had to lie down once per hour for at least 15 minutes, that her impairments interfered with the activities of her daily life, and that her cognitive levels were at primary-school levels. The consulting physician concluded that her impairment was mild and did not prevent her from performing work at the sedentary level, with her employer allowing her to change positions as needed.

1. Defendant asserts in its brief that the vocational and medical experts it hired were "independent"; however, review of the web sites maintained by the companies providing such experts tend to indicate that they are for hire by employers for purposes of reducing costs.

For example, Intracorp, the source for defendant's vocational expert, touts:
> And we know how to reduce administrative, medical, wage loss and litigation costs and—more important—the indirect costs related to lost productivity, hiring and re-training.
> Intracorp provides the industry's broadest range of programs to help resolve complex claims quickly and *drive consistent return-to-work outcomes*.

(Emphasis added.) And the Network Medical Review Company, the source for the reviewing physician, states in its internet materials:
> NMR's specialty physicians provide an understandable explanation of how the history, physical examination and testing *support the retained functional abilities of an individual*. The Evidence–Based Medical Reports will emphasize the relationship between pathology, impairment and the ability to work and the assessment will be supported by the best evidence from clinical and health-care research, including articles from medical literature, medical text, specialty college publications and other scientifically validated information.

(Emphasis added.) It is clear that the sources of referral in this case indicate that they are not as "independent" as defendant asserts.

## II. Summary Judgment

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the nonmoving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving [sic] party, there is no "genuine issue for trial."

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted; emphasis in the original) (quoting Fed.R.Civ.P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In this case, the parties have submitted cross motions for summary judgment, wherein each side contends that there are no issues for trial and that judgment may be rendered as a matter of law. Finding that the facts are adequately presented in the administrative record, that the court's review is limited to the administrative record that was before the plan administrator, and that no genuine issues of material fact exist, summary judgment is an appropriate means to resolve the issues presented.

## III. The Benefits Decisions

### A. Long–Term Disability Claim

Plaintiff is claiming entitlement to long-term disability benefits. She applied for and received short-term benefits, and receipt of those benefits is not in dispute. Under the terms of the long-term disability plan, a claimant is considered disabled during the first 12 months of eligibility if she was under the regular care of a licensed physician; was continuously unable to perform the substantial and material duties of her regular occupation; and was not working for wages in any occupation for which she was or became qualified by education, training, and experience. After the first 12 months of eligibility, the plan considered a claimant "disabled" if she was under the regular care of a licensed physician; was, because of illness or injury, continuously unable to engage in any occupation for which she was or became qualified based on her education, training, or experience; and was not working for wages in any occupation for which she was or became qualified by education, training and experience.

By letter dated January 11, 2001, defendant informed plaintiff that her disability coverage would be terminated as of January 13, 2002. The administrative decision provided, in relevant part, as follows:

> Based on your age, education, and past work experience, pre-disability salary, geographical location and current functional capabilities, the following occupations are appropriate for your consideration: Telephone Operator ... Telemarketing ... Dispatcher.

It is apparent that a great deal of the medical and vocational evidence was developed after defendant issued its decision, but administrative appeals did not change the underlying basis for decision or the outcome. In the defendant's final review, it determined that the only significant limitation was that of no repetitive movements and that sedentary work would not require repetitive movement.

### B. Social Security Disability Claim

■ The administrative record contains materials that indicate that plaintiff's application for Social Security disability benefits was granted. This court has earlier held that a plan administrator is not bound by such decision; however, the information is relevant because, as this court is most aware, the standards applied by the Commissioner of Social Security in determining whether an applicant retains the residual functional capacity to perform *any* gainful employment are *at least* as restrictive as the plan standards in this case. Indeed, as this court has stated in previously published decisions, the case law that has developed in Social Security cases is most instructive in ERISA disability claims. Even though a plan administrator need not give deference to, or even consider, the ultimate vocational determination of the Commissioner of Social Security, failing to do so would be at the administrator's peril. Although those determinations are not infallible, federal courts are keenly aware of the close scrutiny which claims for Social Security disability benefits receive.

### C. Standard of Review of the Administrative Decision

■ Where a plan administrator is granted discretionary authority by the terms of the plan to determine eligibility or to construe the terms of the plan, the denial of benefits must be reviewed for abuse of discretion. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

Under this deferential standard, the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently.

*Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir.1997). In determining whether discretion has been abused, the Court of Appeals for the Fourth Circuit has identified the following eight factors for consideration by a reviewing court:

(1) the language of the plan;

(2) the purposes and goals of the plan;

(3) the adequacy of the materials considered to make the decision and the degree to which they support it;

(4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan;

(5) whether the decision-making process was reasoned and principled;

(6) whether the decision was consistent with the procedural and substantive requirements of ERISA;

(7) any external standard relevant to the exercise of discretion; and

(8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal–Mart Stores, Inc. Associates Health and Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir.2000).

As will be discussed below, factors three and five through eight have caused this court a great deal of concern about the administrative decision. Further, by referencing "external standards" that have been developed in Social Security disability determinations, this court must find the decision of the fiduciary to be wanting.

■ Under ERISA, a plan fiduciary is obligated to act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). ERISA anticipates that conflicts of interest are inherent in benefit determinations and provides that such conflicts be considered as a factor in determining whether there was an abuse of discretion by a plan's administrator and fiduciary. *Id.* at 233. Where a conflict is shown, the deference to the decision of the fiduciary "will be lessened to the degree

necessary to neutralize any untoward influence resulting from the conflict." *Id.*

The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

*Id.* Where, as here, it is satisfactorily shown that the decision maker has a financial interest that conflicts with its duties as a plan fiduciary, *see* admin. trans, at 501, the "abuse-of-discretion" standard is modified on a sliding scale to counterbalance such impact:

When a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

*Bedrick v. Travelers Ins. Co.,* 93 F.3d 149 (4th Cir.1996) (citations omitted). The modified abuse-of-discretion standard requires close judicial scrutiny of the plan administrator's decision. *Holder v. Woodmen of the World,* 11 Fed.Appx. 103 (4th Cir.2001); *Doe v. Group Hospitalization & Medical Services,* 3 F.3d 80, 82 (4th Cir. 1993).

In this case, plaintiff has satisfactorily shown the probability of a conflict of interest, inasmuch as the decision makers were both fiduciaries under the plan and employees and/or agents of the employer and

carrier who ultimately would have been required to pay, had a decision favorable to plaintiff been rendered.

It appears from the record before the court that the moving force behind both coming to a vocational conclusion and then hiring an independent medical expert was defendant's vocational case manager, Bob Cirnigiaro. As discussed above, he met with plaintiff once, by phone, about six months before her long-term care was denied and asked her questions about her activities of daily living. He also reviewed her medical records and the report of defendant's vocational evaluator. With the exception of the report of the vocational evaluator, who conducted no tests, all of the evidence Mr. Cirnigiaro gathered was supportive of plaintiff's claim. It is apparent that Mr. Cirnigiaro placed great weight upon the "sit-and-squirm" test conducted by the vocational evaluator and that, in turn, the committee that conducted review placed great weight on Mr. Cirnigiaro's opinion, because it found that plaintiff was capable of performing the exact same jobs that Mr. Cirnigiaro had listed.

**D. Scrutiny of the Administrative Decision**

■ While a great deal of information has been provided to this court by both sides, the court has focused on whether there was an abuse of discretion by the fiduciaries in the decision-making process. In such analysis, the court has assessed whether the decision makers considered plaintiff's impairments in combination, whether the decision makers' interpretation of the "objective medical proof" provided by plaintiff in accordance with the plan was within the realm of reason, whether the decision makers properly substituted the opinion of their consulting physician for the judgment of plaintiff's treating physicians (all of whom were

clearly qualified), and whether the decision makers improperly rejected the opinions of a qualified vocational expert that were supported by objective testing. In order to scrutinize the plan administrator's decision, the court has reviewed closely the administrative record.

A primary problem this court has had in conducting its review is the "cart-before-the-horse" approach defendant took in its administrative decision-making process. It appears that there is no orderly process for a claimant to present medical and vocational evidence in support of her claim and no orderly method for defendant to gather its own evidence before it issues a decision. From what this court can piece together, the initial denial, which went unchanged, was issued on the basis of the reports of Mr. Cirnigiaro, a case manager, and defendant's vocational evaluator. While Mr. Cirnigiaro mentions the medical findings of one of plaintiff's treating physicians, he never explains why such treating physician's conclusions are discarded and what basis he has for finding that plaintiff has the residual functional capacity to perform the jobs he has outlined.

While the terms of the plan govern and afford the plan administrator great leeway in determining plan terms, the question for the court is whether the administrators and fiduciaries abused their discretion in the context of a sliding-scale review, which comes down to whether plaintiff received a full and fair review. 29 U.S.C. § 1133(2) (a claimant must be allowed "a full and fair review by the appropriate named fiduciary of the decision denying the claim."); *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154 (4th Cir.1993) (failure to provide "full and fair review" amounts to abuse of fiduciary discretion).

As it has in previous ERISA disability cases, this court has looked to the well-developed principles in this circuit that govern review of final decisions of the Commissioner of Social Security. Just like the plan in this case, the regulations that govern the processing of Social Security claims do not require the adjudicator to be a medical doctor; no deference is given to disability determinations by private insurers; and employees of the plan administrator assist in the processing of claims.

■ Close review of the record reveals that defendants rejected plaintiff's claim, both initially and upon reconsideration, based on a disbelief of the opinions of plaintiff's treating physicians, who ranged from family doctors to specialists. While it is never explained, defendant apparently did not believe plaintiff when she described to Mr. Cirnigiaro the disabling effects of her impairments on the activities of her daily life. Mr. Cirnigiaro noted that plaintiff could perform various jobs, but never explained how she could do so when she had to lay down 15 to 20 minutes per hour. It is the duty of the decision maker, whoever that might be, to at least explain the basis for discrediting the subjective complaints of the claimant. If a decision maker fails to show some rational basis for his decision, a reviewing court can only assume he has none.

This court has attempted to review the totality of the medical evidence in conducting this review. It is consideration of the full panoply of ailments and their combined impact on capacity for work that is important, as appellate courts consistently have found:

> Each illness standing alone, measured in the abstract, may not be disabling. But disability claimants are not to be evaluated as having several hypothetical and isolated illnesses. These claimants are real people and entitled to have their disability measured in terms of total psychological well being.

*Layton v. Heckler,* 726 F.2d 440, 442 (8th Cir.1984). Review of the record and argu-

ments reveals that the plan administrators never considered plaintiff's ailments in combination. In addition, defendant never explained in subsequent reviews how plaintiff, with second-grade math skills and fourth-grade reading skills, could possibly do any of the listed jobs or why the opinion of the vocational expert should be disregarded.

■ An impartial adjudicator, such as a plan administrator, has a *fiduciary* duty, not only to the plan, but also to the beneficiaries. If, as here, an individual's residual functional capacity precludes the performance of past work, other factors, including age, education, and past work experience, must be considered in order to determine if other work can be performed.

■ On the ultimate determination of "disability," courts, as well as disability adjudicators, give little deference to the opinions of medical doctors, absent a showing of their vocational expertise; thus, the plan administrator quite properly ignored the vocational conclusions of plaintiff's doctors. While many doctors are willing to sign letters drafted by attorneys that the patient/client is completely disabled, those opinions carry little weight, and the discussions in the pleadings concerning whether a doctor did or did not find plaintiff to be disabled are not critical to decision. It is a doctor's medical findings, however, that are most helpful in determining what impairments are interfering with a plaintiff's ability to work.

■ Where medical opinions are based on clinical findings, such medical information is most informative on the issue of the severity of a claimant's impairments. To that end, it is an abuse of discretion to reject the medical opinions of a treating physician unless the adjudicator can point to persuasive contradictory medical evidence. *Mitchell v. Schweiker,* 699 F.2d 185 (4th Cir.1983).

Objective medical facts and the opinions and diagnoses of the treating and examining doctors constitute a major part of the proof to be considered in a disability case and may not be discounted....

*Id.* at 187. A treating physician is a physician who has observed the plaintiff's condition over a prolonged period of time. *Id.* The opinion of a treating physician may be disregarded where it is inconsistent with clearly established contemporaneous medical records. *See* 20 C.F.R. § 404.1527(d)(4).

The administrative record in this matter is replete with objective medical findings from plaintiff's treating physicians, and it is apparent that defendant rejected those opinions without ordering an independent medical examination. Defendant, however, did employ a medical expert to scrutinize the records. That medical expert concluded that plaintiff's impairments were mild—a conclusion opposite to those of plaintiff's treating physicians that the impairments were severe. The conclusions of that medical expert as to the impact of such impairments on plaintiff's vocational capacity must also be disregarded.

The court concludes that while the first denial letter was based upon the information gathered by defendant's in-house staff, the final denial was based upon the three-page opinion of the outside expert who reviewed plaintiff's medical evidence. To be able to reject plaintiff's medical evidence, defendant would have to be able to point to relevant contemporaneous medical records that would justify the wholesale rejection of the opinions of plaintiff's treating physicians.

In addition to rejecting plaintiff's medical evidence, defendant has also rejected the plaintiff's own allegations concerning the disabling impact of such impairments on her daily life. In *Hatcher v. Secretary,*

898 F.2d 21, 23 (4th Cir.1989), the Court of Appeals for the Fourth Circuit held, as follows:

> [A disability adjudicator] is required to make credibility determinations—and therefore sometimes make negative determinations—about allegations of pain or other nonexertional disabilities.... But such decisions should refer specifically to the evidence informing the [administrative law judge's] conclusion. This duty of explanation is always an important aspect of the administrative charge, ... and it is especially crucial in evaluating pain, in part because the judgment is often a difficult one....

*Id.* (quoting *Hammond v. Heckler,* 765 F.2d 424, 426 (4th Cir.1985) (citations omitted)). The plan administrator does not reference any specific, relevant evidence that would support not fully crediting plaintiff. The administrative record contains no evidence that would contradict plaintiff's version of her daily activities, and the "sit-and-squirm" observations of the vocational expert have long been held invalid. *Jenkins v. Sullivan,* 906 F.2d 107 (4th Cir.1990). Indeed, the administrative record contains hard evidence that a person, suffering from the diseases suffered by plaintiff, enjoys periods of remission after waking from sleep that can last up to four hours; therefore, the "sit-and-squirm" test performed by the evaluator and relied upon by the plan administrator is not only incompetent, *Jenkins, supra,* but also completely unfair.

Based upon the record that is before this court and was before the administrator, there is no reason to believe that plaintiff has exaggerated her claim or has been untruthful with anyone. The court has also considered the plan administrator's total lack of consideration of the disabling effects of pain. The battle in this circuit over a "pain standard" was fought long and hard and ultimately resulted in a decision favorable to claimants and costly to the Social Security Administration. Whether pain or other subjective symptoms are reviewed in the context of a private or public scheme of insurance, there is little doubt but that the method for reviewing claims of pain will follow the decision of the Court of Appeals for the Fourth Circuit in *Hyatt v. Sullivan,* 899 F.2d 329 (4th Cir.1990) (*Hyatt III* ), in which the court held, as follows:

> Once an underlying physical or mental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree, can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motory disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

*Id.* at 336. The progeny of *Hyatt III* spawned *Mickles v. Shalala,* 29 F.3d 918 (4th Cir.1994), in which Honorable K.K. Hall, Circuit Judge, announcing and concurring in the judgment of the Court of Appeals for the Fourth Circuit, held, as follows:

> This refreshing mode of analysis is precisely what I believe our cases have been striving for. The only fair manner to weigh a subjective complaint of pain

is to examine how the pain affects the routine of life.

*Id.*, 29 F.3d at 921. This is not to say that medical evidence, versus vocational opinions by medical doctors, is not pertinent to determining the vocational impact of pain. As the district court found in *Gallagher v. Reliance Standard Life Ins. Co.*, 171 F.Supp.2d 594 (W.D.N.C.2001), "a physician's opinion is the best evidence for determining when and if an applicant has crossed the threshold of manageable pain." *Id.* at 604. The record contains ample documentation of plaintiff's declining health in the 12 years before the pain became unmanageable.

Defendant simply has not fulfilled its duty of explaining why the medical evidence and the activities of plaintiff's daily life should be disregarded for the opinion of a doctor who reviewed her medical records, but never examined her. It is clear that defendant abused its discretion in rejecting plaintiff's disability claim, because the record contained ample evidence from which a reasonable and impartial adjudicator would have found evidence to support it.

## IV. Conclusion

The administrative record is replete with evidence that supports plaintiff's claims of long-term disability up to the point of decision. This court finds that defendants abused their discretion by rejecting her claims in a manner that was inconsistent with accepted and well-reasoned methodologies for evaluating disability claims, especially claims involving subjective symptoms, such as pain. Plaintiff produced evidence that would have satisfied an impartial decision maker that she was totally disabled.

The court will grant plaintiff's motion for summary judgment, award back benefits allowed by the terms of the plan up to the date of decision, and award future long-term disability benefits payable monthly from decision. Such award of future benefits, however, is dependent upon plaintiff's satisfaction of any continuation provision of the plan, which may include an independent medical examination.

As to an award of attorneys fees, 29, United States Code, Section 1132(g)(1) provides for fees to a party who prevails on a significant issue; however, current case law from the Court of Appeals for the Fourth Circuit requires consideration of five factors:

(1) degree of opposing party's culpability or bad faith;

(2) ability of opposing party to satisfy an award of attorney's fees;

(3) whether an award of attorney's fees against the opposing party would deter other persons acting under similar circumstances;

(4) whether the party requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5) the relative merits of the parties' positions.

*Martin v. Blue Cross & Blue Shield of Virginia, Inc.*, 115 F.3d 1201, 1209–10 (4th Cir.1997) (citing *Denzler v. Questech, Inc.*, 80 F.3d 97, 103 (4th Cir.1996)). There is, however, insufficient evidence of record to make such decision at this point. The court, therefore, will withhold entry of a judgment on this matter for 10 days, during which time respective counsel should meet and discuss the actual dollar amount of back benefits, a plan for annual reviews, and whether attorneys fees are appropriate in this matter and in what amount, and then communicate such to the court. The parties should be aware that this court

would allow only a "reasonable fee," which looks to the results obtained for the client, the number of hours, the quality of the work-product submitted, and prevailing hourly rates.

While this is a favorable decision for plaintiff, this court will point out to her that the award may be of little solace if she cannot enjoy the activities of daily living and, perhaps, make every effort to return to work. The opinion of defendant's expert contains valuable information concerning next-generation treatment with a different botulism toxin, and plaintiff should take a copy of such opinion to her neurologist. Plaintiff's goal should not be to continue on disability for the remainder of her life, but to restore her health and return to a productive life. It is clear from plaintiff's work history that she is diligent and has no fear of hard work; with this matter behind her, plaintiff should consider her job to be working on her health and eventually returning to work.

Finally, the court appreciates the fine manner in which respective counsel have managed this case and thoroughly briefed the issues.

### ORDER

**IT IS, THEREFORE, ORDERED** that plaintiff's Motion for Summary Judgment (# 9) be, and hereby is, **GRANTED,** and that defendants' Motion for Summary Judgment (# 12) be, and hereby is **DENIED.**

**IT IS FURTHER ORDERED** that defendants will pay all benefits to plaintiff that she would have been entitled to had defendants adjudicated her claim in her favor as of the date of initial entitlement to long-term benefits.

**IT IS FURTHER ORDERED** that the parties will submit briefs on attorney fees, costs, and prejudgment interest, limited to 10 pages per side, not later than 10 days

hence, and after consideration of such briefs, the court will reduce its conclusions to judgment.