**Mary Beth BOYD, Plaintiff,**

v.

**LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, Defendant.**

**No. CIV. 5:03CV118.**

United States District Court, W.D. North Carolina. Statesville Division.

March 11, 2005.

Daniel S. Johnson, Howard C. Colvard, Jr., Vannoy, Colvard, Triplett & Vannoy PLLC, N. Wilkesboro, NC, for Plaintiff.

Ashley B. Abel, Kristin E. Brooks, Jackson Lewis LLP, Greenville, SC, for Defendant.

## MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the parties' cross motions for summary judgment.

## I. FACTUAL AND PROCEDURAL HISTORY

This litigation stems from the denial of long term disability benefits to the Plaintiff, Mary Beth Boyd, by the Defendant, Liberty Life, under a Group Disability Insurance Policy covering the Plaintiff as an employee of Lowe's Companies, Inc. Both parties concede that the policy is governed by the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, *et seq.*

The Plaintiff's long term disability claim is based on chronic migraine headaches. **Plaintiff's Memorandum in Support of Motion for Summary Judgment ["Plaintiff's Brief"], filed June 1, 2004, at 3.** The Plaintiff's medical records show that she first complained of severe headaches in October 2001. *Id.* By March 2002, the severity and frequency of her headaches had increased. **Administrative Record, *attached to* Plaintiff's Motion for Summary Judgment, filed June 1, 2004, at 00110.**[1] Dr. Dariel Rathmell, the Plaintiff's family physician, diagnosed the Plaintiff with migraine headaches and prescribed medications for her pain. *Id.* The Plaintiff visited Dr. Rathmell on March 25 and April 1, 2002, with the same symptoms and advised him that she had been unable to work at times because of the pain. *Id.,* at 00111, 00112. Dr. Rathmell recommended the Plaintiff see a neurologist. *Id.,* at 00112.

The Plaintiff first saw Dr. Sandhya Kumar, a neurologist at Wake Forest University ("WFU") Baptist Medical Center on April 18, 2002. Dr. Kumar noted the symptoms the Plaintiff was experiencing and the amount of work she was forced to miss because of the pain associated with her headaches. *Id.,* at 00083. Dr. Kumar diagnosed the Plaintiff as suffering from atypical migraine headaches. *Id.,* at 00086. In order to "rule out any intracranial pathology as well as any sinus infection," Dr. Kumar ordered an MRI of the Plaintiff's brain on April 25, 2002; the results were within normal limits. *Id.,* at 00086–87. Dr. Kumar also changed the Plaintiff's medications to attempt to alleviate her headaches. *Id.,* at 00085–86. The Plaintiff saw Dr. Kumar again on May 22, 2002, where Dr. Kumar changed her medications again and mentioned that at some point Botox injections might be helpful as a treatment for her migraines. *Id.,* at 00089–90. On September 26, 2002, the Plaintiff saw Dr. Kumar again and reported no improvements with regard to her

---

1. The Administrative Record was also filed by the Defendant with its brief in support of summary judgment. *See* **Exhibit A, Adminis-** **trative Record, *attached to* Defendant's Motion for Summary Judgment, filed June 1, 2004.**

headaches. *Id.*, at 00091. At the time of this office visit the Plaintiff reported having had a severe migraine headache for six straight days. *Id.* Dr. Kumar prescribed additional medications to alleviate her headaches and again mentioned that Botox injections may be an effective treatment for the Plaintiff's migraine headaches. *Id.*, at 00092.

On October 7, 2002, the Plaintiff saw Dr. Todd Troost, another neurologist at WFU Baptist Medical Center. *Id.*, at 00094. The Plaintiff reported to Dr. Troost that she experienced daily headaches which intensified throughout the day and were sensitive to light and sound. *Id.* Dr. Troost examined the Plaintiff and determined that she had a Midas Score of 230, putting her in a severe disability category. *Id.* Dr. Troost changed the Plaintiff's medications again and further recommended that she be treated with Botox injections. *Id.*, at 00095. On a Restrictions Form completed by Dr. Troost in January 2003, Dr. Troost noted that he advised the Plaintiff on October 7, 2002, to cease work, although this fact is not specifically included in his notes of Plaintiff's October 7, 2002, office visit. *Id.*, at 00153. However, after this office visit with Dr. Troost, Plaintiff did not return to work again. Plaintiff's Brief, at 2.

Plaintiff was admitted into WFU Baptist Medical Center on October 30, 2002, because of her migraine headaches. Administrative Record, at 00099–102. While hospitalized, the Plaintiff received five doses of DHE and her first Botox treatment. *Id.*, at 00102. The Plaintiff was discharged on November 1, 2002, and reported some immediate relief from her treatments. *Id.* However, the Plaintiff later reported to Dr. Troost that outside of a modest response period of about two days, she did not have a positive response to these treatments. *Id.*, at 00104. Plaintiff visited Dr. Troost again on January 14,

2003, for her second round of Botox treatments.

On January 9, 2003, the Plaintiff submitted her Disability Claim Form requesting long term disability benefits pursuant to the Group Disability Policy to the Defendant. **Defendant's Memorandum in Support of Motion for Summary Judgment ["Defendant's Brief"], filed June 1, 2004, at 4; Administrative Record, at 000191.** On January 3, 2003, Dr. Troost also submitted an attending physician's statement indicating thereon that the Plaintiff suffered from a severe physical limitation from migraine headaches and muscle spasms. *Id.*, at 00193–94.

After reviewing the Plaintiff's medical documentation, the Defendant initially denied Plaintiff's claim for long term disability benefits on the basis that there was no information supporting her disability and "although [the Plaintiff] may have complaints of migraines, there was no diagnostic testing performed to confirm this diagnosis." *Id.*, at 00127. In support of this conclusion the Defendant relied on the fact that Plaintiff's CT scan and MRI's were normal. *Id.* Further, the Defendant noted that the Plaintiff had been diagnosed with severe muscle spasms, but no treatment had been performed to confirm the cause or origin of this condition or its relationship with to Plaintiff's migraines. *Id.*

The Plaintiff appealed the Defendant's initial denial through a letter from her counsel on April 25, 2003, which included additional medical records and reports from the Plaintiff's physicians. Defendant's Brief, at 5. Included in this submission were letters from Dr. Troost and Dr. Rathmell challenging the bases for the initial denial of Plaintiff's benefits. Administrative Record, at 00082, 00105. Each doctor advised that a diagnosis of migraine headaches was a clinical diagnosis, and that there was no treatment or test to

confirm such a diagnosis, as the Defendant's denial letter suggested was required. *Id.* Dr. Troost specifically stated that the tests performed on the Plaintiff were in an effort to rule out other causes of the severe headaches. *Id.*, at 00105. Both reiterated their clinical diagnosis that the Plaintiff suffered from severe migraine headaches. *Id.*, at 00082, 00105.

Upon conducting a review of Plaintiff's medical records, including a review by an independent physician, the Defendant affirmed its initial denial of long term disability benefits to the Plaintiff by letter dated June 17, 2003. *Id.*, at 00065–67. In this letter, the Defendant concluded that there was "insufficient medical evidence to establish that [the Plaintiff's] condition is of the nature and severity which would prevent her from performing the material and substantial duties of her occupation ...". *Id.*, at 00066.

Having exhausted all of her administrative remedies, the Plaintiff initiated this action on August 12, 2003, under ERISA in the General Court of Justice, Superior Court Division of Wilkes County against the Liberty Life Assurance Company, Lowe's Companies, and Lowe's Long Term Disability Plan. *See*, 29 U.S.C. § 1132(a). The Defendant removed the action to this Court on September 12, 2003, on the basis of federal question jurisdiction, and the parties stipulated to the dismissal of all claims other than those asserted against Liberty Life. **Plaintiff's Brief, at 1; Stipulation for Dismissal, filed December 8, 2003.** Both parties moved for summary judgment on June 1, 2004, with respect to the Plaintiff's eligibility for long term disability benefits. In the alternative to its motion for summary judgment with respect to Plaintiff's eligi-

bility, the Defendant also moved the Court for summary judgment with respect to the application of a provision within the policy limiting the Plaintiff's eligibility for long-term benefits to a maximum period of 24 months. The Plaintiff also moved for reasonable costs and attorney's fees under 29 U.S.C § 1132(g). Timely responses to each summary judgment motion have been filed.

## II. STANDARD OF REVIEW

The Fourth Circuit has developed a well-settled framework for reviewing the denial of benefits under ERISA plans. *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir.1997). Pursuant to this framework, in cases where the plan grants the fiduciary discretionary authority to determine participant eligibility for benefits or to interpret plan provisions, the decision is reviewed under an abuse of discretion standard.[2] *Id.* (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)); *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 152 (4th Cir.1996). Applying this deferential standard, a decision by the plan fiduciary should "not be disturbed if it is reasonable, even if the Court would have come to a different conclusion independently." *Ellis, supra* (citing *Firestone*, 489 U.S. at 115, 109 S.Ct. 948). When reviewing the plan fiduciary's decision for reasonableness, the Court should only consider evidence that was before the plan fiduciary at the time of its decision. *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608 (4th Cir.1999).

However, there is a slight change in the deference afforded a plan fiduciary under this standard of review where the plan

---

**2.** In this case, both parties agree that the Defendant had discretionary authority to determine any covered employee's eligibility for

benefits under the plan. *See* **Plaintiff's Brief, at 8; Defendant's Brief, at 7.**

fiduciary is operating under a conflict of interest. *Ellis, supra*, at 233. The Supreme Court has recognized that where such a conflict of interest exists, "that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone, supra* (quotations omitted). The Fourth Circuit has explained that any conflict of interest is to be judged on a case-by-case basis, and should be regarded as one of several factors in reviewing whether the plan administrator had abused its discretion. *Ellis*, 126 F.3d at 233 (citing *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir.1996)). While the reviewing court should never deviate from an abuse of discretion standard, the Fourth Circuit has held that a lessened level of deference should be afforded a plan fiduciary operating under a conflict of interest. *Bedrick, supra.* The Court explained,

> "when a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, [the Court] will not act as deferentially as would otherwise be appropriate. Rather, [the Court] will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict."

*Id.* (quoting *Bailey v. Blue Cross & Blue Shield of Virginia*, 67 F.3d 53, 56 (4th Cir.1995)); *see also Booth v. Wal–Mart Stores, Inc. Assoc. Health & Welfare Plan*, 201 F.3d 335, 343 n. 2 (4th Cir.2000).

■ The Defendant argues in this case that the conflict of interest factor should be given little, if any, weight, and the lessened level of deference should not apply because the Plaintiff has not proven a significant and actual conflict of interest, given the minute size of the potential claim in relation to the size of its company. More specifically, the Defendant argues that the Plaintiff's claim cannot be found to have "significant adverse implications" on a company whose net assets exceed $6 billion. **Defendant's Memorandum in Opposition to Plaintiff's Cross Motion for Summary Judgment ["Defendant's Opposition Brief"], filed June 15, 2004, at 4–5.** However, the Court finds that there is an inherent conflict in a situation like here, where

> [u]ndoubtedly, [the Defendant's] profit ... depends on whether the claims allowed exceed the assumed risks. To the extent [the Defendant] has discretion to avoid paying claims, it thereby promotes the potential for its own profit.... Even the most careful and sensitive fiduciary in those circumstances may unconsciously favor its profit interest over the interests of the plan, leaving beneficiaries less protected than when the trustee acts without self-interest and solely for the benefit of the plan.

*Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 86–87 (4th Cir.1993). Therefore, the Court, while reviewing the denial of benefits to the Plaintiff for an abuse of discretion, will weigh the Defendant's conflict of interest into this determination and, accordingly, will only disturb the administrator's decision if "it is [not] consistent with an exercise of discretion ... acting free of the interests that conflict with [the beneficiary]." [3] *Bedrick, supra* (internal quotations omitted).

---

**3.** In addition to the fiduciary's conflict of interest, the Fourth Circuit has instructed that

## III. DISCUSSION

The issue before the Court is whether the Defendant abused its discretion in denying the Plaintiff long term disability coverage under the terms of the Group Disability Insurance Policy. Under the Group Disability Insurance Policy, the Plaintiff will be deemed eligible for long term disability coverage "when [the Defendant] receives Proof that [the Plaintiff] is Disabled." Administrative Record, at 00022.[4] Under the policy, "Disabled," with respect to long-term disability coverage is defined as,

> if the Covered Person is eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and ... thereafter, the Covered Person is unable to perform, with reasonable continuity, all of the Material and Substantial Duties of Any Occupation.

*Id.*, at 00007. The policy further defines "Material and Substantial Duties" as "responsibilities that are normally required to perform the Covered Person's Own Occupation ... and cannot be reasonably eliminated or modified." *Id.*, at 00009.

In the case at bar, the Defendant denied coverage to the Plaintiff because there was not sufficient proof to find the Plaintiff was disabled as defined in the policy. The Defendant concluded the medical evidence did not support a finding that the Plaintiff was disabled during the 90–day Elimination Period, from October 8, 2002, through January 6, 2003, or in the time period following the Elimination Period. The Defendant relied heavily on the findings of Dr. Jares, the independent physician who reviewed the Plaintiff's medical records, in reaching its final conclusions. The Court will review the Defendant's conclusions and its reliance on Dr. Jares' findings for an abuse of discretion.

### A. The Plaintiff's Disability During the Elimination Period

██ The Defendant argues that the Plaintiff's disability improved in degree following the beginning of the Elimination Period and, therefore, the Plaintiff was not disabled, as defined in the policy, during this entire period. Defendant's Brief, at 9.

---

in reviewing a plan fiduciary's determination as reasonable under an abuse of discretion standard,

> a court may consider, but is not limited to, such factors as: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation is consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; [and] (7) any external standard relevant to the exercise of discretion.

*Booth*, 201 F.3d at 343. In reviewing the Defendant's denial of benefits under the poli-

cy, the Court will consider each of these factors that are relevant.

4. "Proof" is defined in the policy as

> evidence in support of a claim for benefits and includes, but is not limited to, ... a claim form completed and signed ... by [the Plaintiff]; ... an attending Physician's statement completed and signed ... by [the Plaintiff's] attending Physician; and ... the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

Administrative Record, at 00010. The policy also states that "Proof must be submitted in a form or format satisfactory to [the Defendant]." *Id.*

In support, the Defendant cites to notations made by Dr. Troost in December 2002, indicating the Plaintiff felt "some better" and had "been able to pick up [the] level of her activity," after beginning a specific regimen with the drug Zanaflex. *Id.;* Administrative Record, at 00103. The Defendant then cites to the next medical record that post-dates this notation from the Plaintiff's January 14, 2003, Botox treatment,[5] where the Plaintiff reported a two-day respite from her headaches following her hospitalization in October 2002. Defendant's Brief, at 10; Administrative Record, at 00104. Finally, the Defendant cites to a February 18, 2003, statement from Dr. Troost indicating the Plaintiff's headaches continue daily but are "less severe." Defendant's Brief, *supra;* Administrative Record, at 00124. Primarily from these notations, the Defendant concludes that the Plaintiff's condition had improved following October 7, 2002, to the point that she was no longer disabled as defined by the policy.

The Court finds this determination by the Defendant to be unreasonable in the face of the totality of the Plaintiff's medical records and other evidence of her condition during the Elimination Period. During the Elimination Period, the Plaintiff's physicians noted she was experiencing constant, daily pain assessed by the Plaintiff to be 3 out of 10 on the pain scale, Administrative Record, at 00094, 00097, 00099; which intensified during the day, *id.,* at

00094; with sensitivity to light and noise, *id.,* at 00094, 00097, 00099; or to any increases in activity, *id.,* at 00103; accompanied with occasional nausea, *id.,* at 00094, 00099; vomiting, *id.,* at 00099; tingling extremities, *id.,* at 00094; jaw pain, *id.;* nasal congestion, *id.;* tearing, *id.;* blurred vision, *id.,* at 00094–95, 00097–98, 00102; floaters in her vision, *id.,* at 00099; leg weakness, *id.;* diarrhea, *id.;* and chills, *id.,* at 00098, 00102; all of which were attributable to a diagnosis of the Plaintiff's migraine headaches. Plaintiff also complained of severe neck and back spasms, whose relation with the migraine headaches has not been fully diagnosed. *Id.,* at 00104. Plaintiff was hospitalized due to the severity of her headaches on October 30, 2002, complaining of a pain level of 9 out of 10. *Id.,* at 00099. The Plaintiff had previously stated to her doctors that she was unable to be at work when suffering from a headache. *Id.,* at 00084, 00091. Additionally, the Plaintiff suffered from the side effects of her pain medication which make it difficult for her to work. *See id.,* at 00089 (Plaintiff explaining how her medications made it difficult to think clearly and concentrate at work).

Further, the physicians' notations cited by the Defendant to demonstrate the Plaintiff's improvement were juxtaposed by other notations demonstrating the continuing severity of the Plaintiff's headaches.[6] For example, despite the fact the

---

5. The Court notes that the Defendant repeatedly refers to the January 14, 2003, Botox treatment as the first such treatment for the Plaintiff. *See, e.g.,* **Defendant's Brief, at 12** ("It was not until January 14, 2003 ... when [the Plaintiff] first received [a Botox injection].**"). However, the Plaintiff's medical records show that she first received Botox treatment from Dr. Troost while in the hospital in late October 2002. Administrative Record, at 000102 ("**During her hospital course, she did receive Botox injections from Dr. Troost ....**"). Therefore the January 14,

2003, treatment was actually the Plaintiff's second such treatment.

6. In addition, the Court notes that on both an attending Physician's Form dated January 3, 2003, and a Restrictions Form dated January 29, 2003, Dr. Troost noted that the Plaintiff suffered from a severe physical limitation leaving her "incapable of minimum activity," which indicates that any improvement the Plaintiff may have had prior to those dates during the Elimination Period was slight at

Plaintiff reported she felt "some better" on December 12, 2002, Dr. Troost determined that the Plaintiff was "not medically capable to return to work at [that] time." *Id.*, at 00103. The Plaintiff also reported on this visit that although her activity level was increasing, her headaches were also increasing in frequency. *Id.* At her January 14, 2003, Botox treatment, the Plaintiff reported that despite having a few days of relief following her hospitalization and initial Botox treatment, the Plaintiff "[did] not think she had a positive response." *Id.*, at 00104. In the February statement, although Dr. Troost indicated the Plaintiff's headaches were less severe, he also stated they continued daily and again implied that the Plaintiff was not in a position, medically, to return to her work or pre-disability activities. *Id.*, at 00124.

This Court has previously recognized that within our circuit,

> "[o]nce an underlying physical or mental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence."

*Willis v. Baxter Int'l, Inc.*, 175 F.Supp.2d 819, 833 (W.D.N.C.2001) (quoting *Hyatt v. Sullivan*, 899 F.2d 329, 336 (4th Cir.1990)). Here, the Plaintiff's physicians have clinically diagnosed her as suffering from migraine headaches, a diagnosis which is not disputed by the Defendant or the physician who conducted the independent medical review of the Plaintiff's records at the Defendant's request. Therefore, the Defendant must consider the Plaintiff's accounts of the pain associated with the condition as evidence of her disability.

Given the evidence on the record and the Defendant's failure to address the severity of Plaintiff's symptoms, the Defendant necessarily must have discredited the Plaintiff's accounts of the disabling effects of her migraine headaches in reaching the conclusion to deny her disability coverage. The Court recognizes that in reaching its conclusions, the plan administrator "is required to make credibility determinations—and therefore sometimes negative determinations—about allegations of pain or other nonexertional disabilities ... [b]ut such decisions should refer specifically to the evidence informing the [administrator's] conclusion." *Willis, supra* (quoting *Hatcher v. Secretary*, 898 F.2d 21, 23 (4th Cir.1989)). The Defendant has not put forth any evidence why Plaintiff's accounts of the disabling effects of her migraine headaches should be discredited. In fact, in both letters to the Plaintiff denying her initial request for coverage and denying her appeal, the Defendant failed to even note the symptoms she expressed and her accounts of their disabling effects, instead claiming that there was no evidence to support her disability claims. The Defendant has instead based its case, in part, on a few positive statements made by the Plaintiff, indicating a slight improvement in response to certain drugs, often found in the same medical records along with other statements reiterating the disabling effects of her headaches. The Court finds it was an abuse of discretion to reject Plaintiff's claim for a lack of evidence of the disabling effects of her migraine headaches, as the record contained "ample evidence from which a reasonable and impartial adjudicator would have found just such supporting evidence." *Willis*, at 834.

 The Defendant also argues that during this period the Plaintiff's physicians

most. Administrative Record, at 00153, 00194.

failed to recommend that she should not work because of her headaches or to indicate that she was disabled to the extent that her work performance was effected. Defendant's Brief, at 13 ("**Indeed, the medical records do not indicate that Plaintiff's physicians recommended that she quit her job or indicate that she could not perform her job.**"). Instead, the Defendant argues, the Plaintiff "voluntar[ily] ... quit her job." *Id.*, at 11. However, this conclusion is in direct conflict with the Plaintiff's medical evidence from Dr. Troost. On a Restrictions Form, completed at the request of the Defendant, Dr. Troost reported that he advised the Plaintiff to cease work on October 7, 2002. Administrative Record, at 00153. On that day, Dr. Troost determined that the Plaintiff had a Midas test score of 230, putting her in the category of suffering from a severe disability. *Id.*, at 00094. Indeed, after October 7, 2002, the Plaintiff did not return to work. Defendant's Brief, at 4. On December 12, 2002, two months into her Elimination Period, Dr. Troost noted that Plaintiff remained "medically incapable of returning to work." Administrative Record, at 00103. Dr. Troost also described the Plaintiff as disabled and unable to work in a letter in response to the initial denial of Plaintiff's claim, as Defendant did note, *id.*, at 00082 ("**Unfortunately the headaches have not responded to a variety of treatments and she is considered currently disabled due to migraine.**"), and in two forms completed at the request of the Defendant at the conclusion of the Elimination Period, *id.*, at 00153, 00194 (**indicating the Plaintiff had a severe physical limitation**). Defendant seeks to discount the opinions of the Plaintiff's attending physician on the grounds that they possess an inherent conflict of interest and a treating physician would tend to favor a patient's unverifiable accounts of the severity of this condition over an alternative diagnosis. Defendant's Opposition Brief, at 13–14. However, this Court has recognized that while a court should not always defer to a treating physician's opinion on the ultimate issue of disability, his opinion as to the severity of the impairment and the interference to the patient's ability to work that such an impairment causes, generally should not be rejected "unless the adjudicator can point to persuasive contradictory medical evidence." *Willis*, 175 F.Supp.2d at 832 (quoting *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983)). Here, the Defendant appears to have disregarded the opinion of Plaintiff's treating physicians on the severity of the Plaintiff's condition and her inability to work, solely on the basis of the opinion of Dr. Jares who, though independent and having reviewed the Plaintiff's records, never personally examined the Plaintiff. The Court finds the Defendant's ultimate conclusion and its reliance on Dr. Jares' opinions contradicting the Plaintiff's treating physicians are unreasonable given the absence of contradictory medical evidence and the extent of the Plaintiff's disability revealed in her medical records and supported by her physicians' observations and opinions.

The Court finds that the only reasonable determination, given the severity of the patient's symptoms coupled with the opinions and notes of the Plaintiff's physicians during this period, is that the Defendant was presented with evidence showing that the Plaintiff was unable to perform the material and substantial duties of her position during the policy's Elimination Period. Therefore, the Defendant's determination to the contrary and the denial of the benefits to the Plaintiff on these grounds was an abuse of its discretion. However, the Defendant's ultimate denial of benefits to the Plaintiff may remain untouched by this Court if the Court finds that the Defen-

dant was reasonable in concluding that the Plaintiff's medical records do not justify a finding that she was disabled following the Elimination Period and her January 14, 2003, Botox treatment.

## B. The Plaintiff's Disability Following the Elimination Period

■ The Defendant concluded that there was insufficient medical records and evidence to prove that the Plaintiff was disabled, as defined in the policy, following the Elimination Period which ended on January 6, 2003. Specifically, the Defendant argues that there are no medical records documenting the response from the Plaintiff's Botox treatment on January 14, 2003. The Defendant argues that this absence of medical records indicating the Plaintiff's response to the Botox treatment gives rise to an inference that the Plaintiff "did not have a recurrence of pain or other symptoms of such severity as to require medical intervention during [this period] ... [and] that Plaintiff no longer suffers headaches of such intensity to warrant treatment or preclude her work [sic]." Defendant's Brief, at 13.

The Court finds that the Defendant's conclusions are unreasonable in light of the evidence contained in the record. First, as noted earlier, the Defendant and Dr. Jares erroneously argue that the January 14, 2003, Botox treatment was the first such treatment for the Plaintiff, and therefore, there exists a total absence of medical documentation of the Plaintiff's response to Botox treatments. *See* Defendant's Brief, at 12; Administrative Record, at 00071. In fact, the January 14, 2003, treatment was the second such treatment for the Plaintiff. *See* Administrative Record, at 0102. While hospitalized in October 2002, some three months earlier, she had received her first Botox treatment and reported in an overall evaluation that there had been no positive response to the treatment apart from a few days of relief. *See id.,* at 00104, 00049. Dr. Troost notes the Plaintiff's response to the first round of Botox treatment in his notes from the Plaintiff's January 14, 2003, Botox treatment. *Id.,* at 00104.

Further, the Court finds that there was some medical evidence available regarding the Plaintiff's condition post-January 14, 2003; specifically a Restrictions Form completed by Dr. Troost on January 29, 2003, and notes from interviews with the Plaintiff and her physicians from February 2003. *See id.,* at 00153, 00049–52. The Restrictions Form, completed by Dr. Troost on January 29, 2003, at the request of the Defendant, and two weeks following the Plaintiff's second Botox treatment, indicated that the Plaintiff suffered from a slight mental limitation and a severe physical limitation. *Id.,* at 00153. Dr. Troost explained that the Plaintiff's condition imposed a severe limitation on her functional capacity which left her incapable of minimum activity. *Id.* Dr. Troost included in his objective medical findings that the Plaintiff suffered from daily headaches, photophobia and phonophobia, occasional tingling in upper extremities, and severe neck, back, and shoulder muscle spasms. *Id.*

Furthermore in February 2003, Patricia Reiner, the Nurse Case Manager assigned to conduct the review of Plaintiff's claim, upon noticing the absence of medical records following the Plaintiff's January 14, 2003, Botox treatment, contacted the Plaintiff and her physicians regarding the Plaintiff's current condition and her response to the recent treatment. *Id.,* at 00048 (**recommending contacting the Plaintiff and her physician "to clarify intensity and frequency of headaches, functional capacity, perception of illness, and efficacy of the Botox treat-**

ments"). Reiner spoke with the Plaintiff on or around February 12, 2003. *Id.*, at 00049–50. The Plaintiff described to Reiner the current symptoms she was experiencing, including daily headaches that increased in severity as the day progressed and with exposure to sound, constant pain levels of at least 3 out of 10 in her own assessment, and floaters in her vision and tingling sensations in her scalp as the headaches intensified.[7] *Id.* The Plaintiff described how her headaches prevented her from watching television or vacuuming because of her sensitivity to noise, prevented her from multi-tasking, and required her to take daily naps. *Id.* She was no longer able to drive and often was unable to help around the house at all. *Id.* She also explained to Reiner that she kept in constant contact with her doctor regarding her symptoms and responses. *Id.* The Plaintiff explained she had received two treatments of Botox, without any relief following the first treatment[8] and with only one day of relief followed by three days of severe headaches following her second treatment. *Id.*, at 00049.

Reiner likewise contacted the office of the Plaintiff's attending physician, Dr. Troost. Reiner received a signed statement from Dr. Troost, through his nurse, that the Plaintiff's symptoms continued on a daily basis but were less severe. *Id.*, at 00124. Dr. Troost explained he could not give a long-term prognosis or a time frame for a return to the Plaintiff's pre-disability functional abilities. *Id.* The statement did not change Dr. Troost's analysis a month earlier, and 15 days after the Plaintiff's second Botox treatment, that the Plaintiff had a slight mental limitation and a "severe" physical limitation of her functional

capacity, leaving the Plaintiff "incapable of minimum activity." *See id.*, at 00153.

The Defendant's conclusions with regard to the Plaintiff's response to Botox treatment again rely heavily on the findings of Dr. Jares. Dr. Jares found that "based on the objective medical information submitted, [the Plaintiff] retains the ability to work a full-time sedentary occupation." *Id.*, at 00071. In its denial letter to the Plaintiff's counsel in response to the Plaintiff's appeal, the Defendant echoed these conclusions from Dr. Jares. *Id.*, at 00066. Dr. Jares, like the Defendant, grounded his conclusion primarily on the lack of medical records documenting the Plaintiff's responses to treatment after January 14, 2003, but notably, did not identify specific objective medical evidence supporting his conclusion. *Id.*, at 00071. As discussed *infra*, Dr. Jares was mistaken in his belief that the Plaintiff's January 14, 2003, Botox treatment was her first such treatment, instead citing the unknown nature of the Plaintiff's response to the Botox treatment as one factor contributing to his conclusion. *Id.* He stated that if the Plaintiff was "to achieve relief from the Botox injections, [he] would expect it to begin approximately 7 to 14 days after the injection and would hopefully provide sustained duration of affect for at least one to two months." *Id.*, at 00072. The Plaintiff's medical records indicate that Plaintiff had reported no positive response after a day or two of relief from her first Botox treatment in October 2002. *Id.*, at 00104. Similarly, the Plaintiff relayed to Nurse Rainer in their discussion in February 2003, one month after the second Botox treatment, that she had not received any sustained relief from her second treat-

---

7. The Court notes that the Plaintiff's description of her symptoms to Reiner varied only slightly from the symptoms recorded in the notes of Plaintiff's physicians since October 2002.

8. Dr. Troost also noted that Plaintiff had not had a lasting positive response to her first Botox treatment received on October 17, 2002.

ment. *Id.*, at 00049. However, it does not appear that Dr. Jares was given access to the notes from Nurse Ranier's conversations with the Plaintiff. *Id.*, at 00070 (listing materials reviewed by Dr. Jares). Likewise, Dr. Jares does not appear to have been given a copy of the Restrictions Form completed by Dr. Troost on January 29, 2003, 15 days after the Plaintiff's second Botox treatment, indicating that Plaintiff had a severe physical limitation at that time. *Id.*, at 00070, 00153.

The Court finds the Defendant's conclusion, and its reliance on the same conclusions from Dr. Jares, that there was not sufficient documentation to demonstrate the Plaintiff was disabled in the period following the Elimination Period was unreasonable. Defendant had evidence before it that the Plaintiff had not positively responded to two Botox treatments, had severe functional limitations, and was continuing to have daily, severe headaches after January 6, 2003. Similarly, the Defendant's conclusion that the absence of medical records after January 14, 2003, creates an inference that the severity of Plaintiff's headaches no longer limited her ability to work is unsupported, contrary to the evidence before it at that time, and, therefore, unreasonable.

In sum, the Court finds that the Defendant abused its discretion in denying the Plaintiff long term disability benefits under the Group Disability Policy. The Court, therefore, denies the Defendant's motion for summary judgment and grants the Plaintiff's motion for summary judgment as to the Plaintiff eligibility for long term disability benefits.

## IV. DEFENDANT'S MOTION TO LIMIT PLAINTIFF'S MAXIMUM BENEFIT PERIOD TO 24 MONTHS

■ The Defendant has moved the Court, in the alternative, to limit the Plain-

tiff's maximum benefit period to 24 months because the Plaintiff's disability is based on a diagnosis due to Non–Verifiable Symptoms, as defined in the policy. Under the Group Disability Policy "[t]he benefit for Disability due to Mental Illness, Substance Abuse, or Non–Verifiable Symptoms will not exceed a combined period of 24 months of Monthly Benefit payments . . . ." Administrative Record, at 00025. The policy defines non-verifiable symptoms as

the Covered Person's subjective complaints to a Physician which cannot be diagnosed using tests, procedures or clinical examinations typically accepted in the practice of medicine. Such symptoms may include, but are not limited to, dizziness, fatigue, headache, loss of energy, numbness, pain, ringing in the ear, and stiffness.

*Id.*, at 00009.

Plaintiff initially opposed the Defendant's motion on the grounds that the policy dictates that the determination of the length of the Plaintiff's disability coverage should be based on the ability of the Plaintiff to present to the Defendant evidence of her continuing disability. Therefore, this determination should be made based on future evidence not before the Court or the Defendant at this time. The Court disagrees. Whether the Plaintiff's disability is due to non-verifiable symptoms may be determined at the time the disability is recognized. Future evidence of the Plaintiff's continuing disability will not change the underlying source of the Plaintiff's disability for which she is currently eligible for benefits. The Plaintiff's ability to present evidence of her continuing disability is, instead, only pertinent to her continued receipt of benefits during the life of her eligibility under the policy, whether

shortened to 24 months by the non-verified symptoms limitation or not.

In the alternative, the Plaintiff argues that her condition has been clinically diagnosed and, therefore, is not subject to the "non-verifiable symptoms" provisions included in the policy. The Court finds that the Plaintiff's argument misinterprets the terms of the policy. The Plaintiff's disability, though it has been clinically diagnosed as migraine headaches, is nonetheless due to Non–Verifiable Symptoms as defined in the Policy. Plaintiff's symptoms, from which the clinical diagnosis was made, are the subjective complaints of the Plaintiff of the pain she experiences, and cannot be verified using "tests, procedures, or clinical examinations." In fact, Plaintiff's primary subjective complaint from which her diagnosis was made, headaches, is specifically listed as an example of a Non–Verifiable Symptom in the policy. *Id.*, at 00009.

Plaintiff's reliance on *Conrad v. Continental Cas. Co.*, 232 F.Supp.2d 600 (E.D.N.C.2002), to oppose the Defendant's argument, is misplaced. In *Conrad*, the plaintiff's disability due to fibromyalgia was denied because there was no objective evidence of the plaintiff's condition through "physical, laboratory, or radiological" findings or tests. *Conrad*, 232 F.Supp.2d at 603. However, in resolving this issue in the case at bar, the Court is not determining the ultimate question of whether the Plaintiff is disabled under the policy. Like the court in *Conrad*, this Court has concluded that the Plaintiff's subjective complaints of pain and other symptoms were sufficient to establish that Plaintiff was disabled and, therefore, eligible for benefits under the terms of the policy. *See, infra*, Part III. However, the issue the Court is considering at this time is distinguishable; that is, whether or not the application of the express terms of the Policy stating the Plaintiff's right to bene-

fits beyond 24 months is extinguished where her disability is based on symptoms whose existence cannot be verified outside of the Plaintiff's subjective complaints. Having distinguished *Conrad*, the case is not applicable here. Under the express terms of the policy, the Court finds that because the Plaintiff's disability is due to non-verifiable symptoms, Plaintiff is only entitled to benefits for a period of 24 months.

## V. PLAINTIFF'S MOTION FOR COSTS AND ATTORNEY'S FEES

■ ERISA provides that "a court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The Fourth Circuit has established a five factor test to determine if a party should be awarded attorney's fees. *See Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1028–29 (4th Cir.1993). Therefore, the Court must consider the:

(1) degree of opposing party['s] culpability or bad faith;

(2) ability of opposing part[y] to satisfy an award of attorney's fees;

(3) whether an award of attorney's fees against the opposing part[y] would deter other persons acting under similar circumstances;

(4) whether the part[y] requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5) the relative merits of the parties' positions.

*Denzler v. Questech, Inc.*, 80 F.3d 97, 104 (4th Cir.1996). The Fourth Circuit has further explained,

[This] "five factor approach is not a rigid test, but rather provides general guide-

lines for the district court." Indeed we have recognized that some of the factors may not be appropriate in any given case. Nonetheless, we require the district court to justify an attorney's fee determination by evaluating the five factors in order to give [the Appellate Court] some basis for review.

*Id.* (quoting *Quesinberry, supra,* at 1029). The Court also notes that the Fourth Circuit has rejected the proposition that all prevailing parties under ERISA are entitled to attorney's fees under the statute. *Quesinberry,* 987 F.2d at 1030.

In the case at bar the Court determines that the Plaintiff should be awarded reasonable attorney's fees. With regard to the first factor, the Court finds that while there is no evidence that the Defendant acted in bad faith, it is culpable in this matter for not properly considering all of the medical evidence in the record of the severity of Plaintiff's condition and the opinions of her treating physicians with regard to her ability to work. Instead, the Defendant deferred to the opinion of Dr. Jares, who does not appear to have examined all of the relevant medical evidence and did not personally examine the Plaintiff. This factor, therefore, favors an award of attorney's fees to the Plaintiff. The Court also finds the second factor weighs in favor of an award of attorney's fees. The Defendant has stated that it has net assets valued in excess of $6 billion and, therefore, can easily satisfy an award of attorney's fees. **Defendant's Opposition Brief, at 4–5.** Further, the fifth factor also weighs in favor of an award of attorney's fees. The Court has found that the only reasonable conclusion that an unbiased adjudicator could reach was that the Plaintiff was disabled under the terms of the policy.

Although the Court finds that the third factor is neutral in this analysis and the Plaintiff concedes that the fourth factor weighs against an award of attorney's fees, these factors do not otherwise persuade the Court that such an award is not appropriate on the evidence contained in the record. Therefore, the Court grants the Plaintiff's motion for reasonable attorney's fees.

## VI. ORDER

**IT IS THEREFORE ORDERED** that Defendant's motion for summary judgment as to the issue of Plaintiff's eligibility for benefits is **DENIED;** and as to the issue of the application of a provision within the policy limiting the Plaintiff's eligibility for long term benefits to a maximum period of 24 months, the Defendant's motion for summary judgment is **ALLOWED.**

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment as to the issue of Plaintiff's eligibility for benefits is hereby **ALLOWED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that Plaintiff's motion for costs and attorney's fees is hereby **ALLOWED.**

A Judgment is filed herewith.

### *JUDGMENT*

For the reasons set forth in the Memorandum and Order filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED** that the Plaintiff's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART,** and she is entitled to disability benefits under the Defendant's Group Disability Income Policy.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Defendant's motion for summary judgment is **ALLOWED IN PART AND DENIED IN PART,** and the Plaintiff's entitlement to

disability benefits under the Defendant's Group Disability Income Policy is limited to 24 months.

**IT IS FURTHER ORDERED** that the Plaintiff's motion for costs and attorney's fees is **ALLOWED**.